*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0152P (6th Cir.)
File Name: 00a0152p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

THE LINCOLN ELECTRIC
COMPANY,

       *Plaintiff-Appellee/*
       *Cross-Appellant,*

       *v.*

ST. PAUL FIRE AND MARINE
INSURANCE COMPANY,

       *Defendant-Appellant/*
       *Cross-Appellee.*



Nos. 98-4236/4340

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 96-00537—James S. Gwin, District Judge.

Argued: November 2, 1999

Decided and Filed: April 27, 2000

Before: KEITH, NORRIS, and CLAY, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Clifford M. Sloan, WILEY, REIN & FIELDING, Washington, D.C., for Appellant. Robert S. Walker, JONES, DAY, REAVIS & POGUE, Cleveland, Ohio, for Appellee.

**ON BRIEF:**    Clifford M. Sloan, WILEY, REIN & FIELDING, Washington, D.C., Thomas P. Kane, OPPENHEIMER, WOLFF & DONNELLY, St. Paul, Minnesota, for Appellant.  Robert S. Walker, Brian F. Toohey, Mark J. Andreini, JONES, DAY, REAVIS & POGUE, Cleveland, Ohio, Michael H. Ginsberg, Peter D. Laun, JONES, DAY, REAVIS & POGUE, Pittsburgh, Pennsylvania, for Appellee. Gerald V. Weigle, DINSMORE & SHOHL, Cincinnati, Ohio, Mary A. Cavanaugh, Dennis R. Lansdowne, SPANGENBERG, SHIBLEY & LIBER, Cleveland, Ohio, Mitchell F. Dolin, COVINGTON & BURLING, Washington, D.C., Thomas J. Quinn, MENDES & MOUNT, New York, New York, for Amici Curiae.

---

## OPINION

---

ALAN E. NORRIS, Circuit Judge.  Defendant St. Paul Fire and Marine Insurance Company ("St. Paul") appeals a district court judgment and award entered pursuant to a bench-trial verdict for plaintiff, the Lincoln Electric Company ("Lincoln Electric").  The trial concerned a dispute over products liability insurance policies that Lincoln Electric purchased from St. Paul over the course of several decades.  The policies were altered over time as to the levels of deductibles for 1) assessed product-related injury liability and 2) legal costs associated with litigation stemming from the covered product-related injuries.  The basis for insurance coverage between the parties also changed from an "occurrence" basis (coverage from the date of the injury)  to a "claims" basis (coverage from the date of the lawsuit), creating a situation where some claims against Lincoln Electric could simultaneously trigger the "occurrence" policy and the "claims" policy.

In addition, the parties have had a long-standing disagreement about how they should determine when a particular policy has been triggered by a claim involving a

benefits of a double-auditing system.  It was in a position to act much earlier in order to prevent some of the inconvenience and cost associated with this legal controversy.

We affirm the district court's refusal to award attorney's fees on the ground that the recently enacted Ohio statute compels that result.

### III.

We affirm in part, reverse in part, and remand the case to the district court for further proceedings required to implement the holdings in this opinion.  We find that the parties properly raised their arguments on appeal.  The district court did not commit clear error or legal error in reaching its determination that St. Paul was liable for failing to adhere to the terms of its policies held by Lincoln Electric.  The district court did not commit clear error or legal error in finding that St. Paul was liable pursuant to "missing" polices dating from 1945 to1972 that were held by Lincoln Electric.  We reverse the district court with regard to the process it used to reconcile the contractual policy relationship of the parties with the long-term exposure and delayed manifestation injury claims of the type associated with the "welding-fumes"/"asbestos exposure" sort of injury, and direct it to follow the four-step process articulated in this opinion to determine whether any adjustments in the base judgment award are needed.  We reverse the district court with respect to the method it used to calculate prejudgment interest, and direct it to 1) take the corrected base award, 2) add prejudgment interest, which is to be calculated using an accrual date of February 22, 1996, and 3) accompany the total judgment award with a clear written explanation concerning the statistical, mathematical, accounting, and data processing assumptions and procedures utilized to arrive at the base, prejudgment interest, and final judgment award figures.  We affirm the district court's decision not to award attorney's fees to Lincoln Electric.

and that is pending in a court of record on that date. Thus, this case is subject to the new statute because this case was commenced prior to the effective date, and remains pending in a court of record. As the letter suggests, the following provisions from R.C. § 2721.16(A) now govern:

> A court of record shall not award attorney's fees to any party on a claim for declaratory relief . . . unless a section of the Revised Code explicitly authorizes [it] or unless an award of attorney's fees is authorized by section 2323.51 of the Revised Code, by the Civil Rules, or by an award of punitive or exemplary damages against the party ordered to pay attorney's fees.

St. Paul's letter correctly observes that none of the three statutory prerequisites is satisfied by Lincoln Electric's claim for fees.

Lincoln Electric did not file a written argument in response to St. Paul's letter, but did assert at oral argument that section 2721.16(A) does not apply to this case because the statute concerns only a declaratory judgment action and Lincoln Electric was suing for breach of contract. We disagree with that argument. St. Paul filed in federal district court in Minnesota seeking declaratory judgment on March 11, 1996, and Lincoln Electric responded by filing an action in the Northern District of Ohio. The Minnesota action was transferred to the Northern District of Ohio and consolidated as a diversity of citizenship action under 28 U.S.C. § 1332, and Ohio law was properly applied. Additionally, this court has not adopted Lincoln Electric's theory concerning its contractual policy relationship with regard to long-term exposure and delayed manifestation injury "welding fume" and "asbestos exposure" claims. It would thus be inaccurate to describe St. Paul's reluctance to cooperate as "wrongful" under *Allen v. Standard Oil Co.*, 2 Ohio St.3d 122, 122, 443 N.E.2d 497, 497 (Ohio 1982), even if one assumes that the syllabus in *Allen* is still good law following the new Ohio legislation. Finally, we note that Lincoln Electric enjoyed the

long-term exposure and delayed manifestation injury. This question is of special importance to both parties and to the products-liability insurance market. Since the 1970s there has been an explosion in class-action suits by welders for medical problems alleged to have resulted from exposure to asbestos, manganese, and welding fumes. Lincoln Electric, along with many other similarly-situated industrial entities, has faced thousands of these class-action suits. Typically, the suits allege both harmful exposure for decades and delayed manifestation of injury, but do not allege any precise moment of transformation from wellness to infirmity.[1] These characteristics can result in both the industrial entity and its insurer having a strong fiscal incentive to manipulate the "triggering" date. Both parties may do this in order to take advantage of what each considers to be the most favorable set of policy terms (e.g., deductibles and assumption of legal

---

[1] Exposure, a discrete temporal moment of injurious transformation, manifestation, and diagnosis are different concepts and represent events that may or may not be at different periods of time (although they can occur either simultaneously or in the sequence listed above). "Exposure" is a physical bodily encounter with a harmful substance, e.g., breathing asbestos fibers into the lungs. "A discrete temporal moment of injurious transformation" denotes the precise moment when, for example, cancerous cells first appear in the exposed lungs. "Manifestation" refers to the period of time when the injury becomes susceptible to observation by a reasonable person with an actual opportunity to observe its signs and symptoms. Manifestation can also occur when the injury becomes susceptible to observation by a reasonable person in a position to observe the signs and symptoms of the injury. For example, if cancer in the lungs caused by asbestos began to cause unusual pain in the lungs or a coughing of blood, manifestation would have occurred even if the injured individual failed at that time to take notice and attach significance to the developments. Finally, "diagnosis" concerns an authoritative attribution of medical significance to a manifestation of signs or symptoms of an injury. Most often diagnosis will result from the methodological examinations and informed conclusions of medical professionals. In our example, diagnosis would occur when a doctor examines the injured person and concluded that lung cancer was indicated by the evident signs and symptoms.

costs) found at some chronological point along the time-frame of a long-standing insurance relationship.

On appeal, St. Paul asserts that it fulfilled its contractual obligations and that the district court erred in finding any liability whatsoever on its part. It contends that the district court reached its finding of liability by misapplying the voluntary payment and mistake of law doctrine and the course of conduct doctrine. St. Paul also argues that the district court applied an incorrect standard of proof when it reached a factual finding for Lincoln Electric concerning the contents of "missing" policies covering the years 1945 to 1972. St. Paul further believes that, even if there was liability on its part, the district court should have equitably allocated the application of the claims to the various triggered policies rather than allowing Lincoln Electric to "pick and choose" between policies while invoking coverage for each claim. Finally, St. Paul asserts that even if it loses every other issue on appeal, the judgment award should be reduced because the district court utilized an incorrect accrual date which resulted in exorbitant prejudgment interest.

Lincoln Electric asserts that the district court's judgment should be upheld because it was not clearly erroneous, and, on cross-appeal, takes issue with the district court's refusal to award attorney's fees.

We affirm in part and reverse in part.

## I.

### 1.    The Pre-1979 (September 1945-79) Relationship

Lincoln Electric, a manufacturer of industrial products, including welding rods, is an Ohio corporation with its principal place of business in Ohio. St. Paul is a Minnesota corporation with its principal place of business also in that state. By 1979, Lincoln Electric and St. Paul had a longstanding commercial relationship stretching back to at least 1945, with St. Paul issuing insurance policies to Lincoln

defendant insurer about the problem (particularly where there is gross negligence, a lack of good faith, or fraud[33]), and 2) will always begin at or before the date at which the insurer was served with notice of a court action as to the matter.

We remand this case back to the district court to recalculate prejudgment interest. The district court must first ensure that it has reached the correct base amount for the judgment award by reconciling the contractual policy relationship with long-term exposure and delayed manifestation injury "welding fume" and "asbestos exposure" claims though use of the calculation process described in the previous section of this opinion. The court can then properly calculate prejudgment interest by using February 22, 1996 as the date of accrual.

### 7.    Attorney's Fees and St. Paul's Breach of Duty to Defend Lincoln Electric

On cross-appeal, Lincoln Electric challenges the district court's refusal to award it attorney's fees as the prevailing party.

Pursuant to FED. R. CIV. P. 28(j), St. Paul filed a letter with the court on October 15, 1999. The letter included a copy of recently-enacted legislation, OHIO REV. CODE ANN. § 2721.16(A) (1999). St. Paul correctly pointed out that the new statute expressly applies to pending cases because it governs any Ohio declaratory judgment action or proceeding that was commenced prior to the effective date of this section,

---

[33] According to the district court, St. Paul breached the policies by implementing a trigger "that was to its benefit and to the detriment of Lincoln Electric, while at the same time not disclosing to Lincoln Electric other potential triggers of coverage." At the same time, St. Paul had not breached a duty of good faith because it had acted with "reasonable justification" in its treatment of Lincoln Electric's claims. Had the district court found that St. Paul acted fraudulently or in violation of the duty of good faith, the date the district court chose for prejudgment accrual might well have been appropriate under Ohio law as characterized by approach four.

To impute accrual of interest before the date at which the insurer should have known that it was breaching its duty to defend is to also effectively impute a contractual term that did not exist. Absent explicit agreement to the contrary, business parties in an insurance relationship with a double auditing procedure share equally in the risks of possible costs associated with  mutually undetected mistakes occurring in the administration of the insurance relationship.  Equal sharing of risk exists regardless of whether a particular mistake happens to result in over-payment or under-payment, until or unless either 1) one party explicitly assumes a disproportionate share of the risk contractually, and the insured incurs actual costs, or 2) the insurer knew or should have known about the failure to fulfill its duty.  Contrary to the district court's suggestion, St. Paul was not in breach of contract until Lincoln Electric alerted St. Paul about its failure to fulfill its duty in February 1996, *and* St. Paul responded by refusing to correct the problem.[32]  St. Paul cannot be deemed to be in breach of contract whenever it happens to inadvertently mishandle one of the thousands of claims it must process within a business relationship of the kind considered in this case.  This is especially true when, as was true here, each party could reasonably have relied upon the other party to render assistance by utilizing the double-auditing procedure to detect errors.

We emphasize that application of this approach can result in different dates of accrual depending on the scenario adopted as true by the factfinder.  The date of accrual 1) can be at or before the date when plaintiff insured notifies

---

[32]"Breach of contract" is "[f]ailure, without legal excuse, to perform any promise which forms the whole or part of a contract."  BLACK'S LAW DICTIONARY 188  (6th ed. 1990).  The district court erred in finding a breach, because  St. Paul had a legal excuse for its failure to perform some of its promises during the period prior to February 22, 1996.  The legal excuse existed because of  the double-auditing scheme, the complexity of the contractual arrangement, and the failure of Lincoln Electric to alert St. Paul to the need to correct any problem.

Electric on a yearly basis.  The James B. Oswald Company ("Oswald"), a Cleveland insurance broker, was St. Paul's agent.  Lincoln Electric was a sophisticated business entity, but an unsophisticated insured; it had no risk management department and relied upon Oswald and, to a lesser degree, St. Paul, for expertise in handling liability insurance matters.

In the years leading up to 1979, the policies contained 1) a $5,000 deductible for indemnity costs related to judgments and settlements from covered injuries,  2) no deductible for legal defense costs, and 3) an "occurrence" or "accident"[2] basis of insurance.   The policies covered "bodily injury . . . caused by an occurrence ["an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury . . . neither expected nor intended from the standpoint of the insured"]."[3]   The policies also granted St. Paul an exclusive contractual "right and duty to defend" Lincoln Electric.

The 1970s witnessed an industry-wide explosion of toxic exposure tort cases, implicating Lincoln Electric and its welding-rod manufacturing business as a defending litigant in thousands of tort cases.  Each case was typically brought by hundreds of welders acting in a class or otherwise cooperating as a concerted group of litigants.  The suits alleged lung disease and/or cancer and/or neurological problems, all arising from decades of exposure to manganese and asbestos

---

[2]An "accident" policy is triggered by allegations of an accident or event during the policy period.  "Occurrence" policies are triggered by allegations of bodily injury during the policy period.  Both occurrence and accident policies provide coverage for liabilities and accidents allegedly occurring during the policy period, even if the lawsuits are filed years later.  According to Lincoln Electric, both types of policies also provide coverage for injuries allegedly resulting from continuous or repeated exposure to harmful conditions.

[3]According to Lincoln Electric, the duty is triggered by an allegation of bodily injury, such as exposure to chemicals, during a policy period.

in the welding rods dating as far back as the 1930s. The plaintiffs did not contend that their injuries were attributable to any single exposure year, but did allege that each exposure caused injury.

By the late 1970s, the extent of Lincoln Electric's exposure to welding fumes cases had become apparent. At the same time, the products liability insurance market was experiencing pressure due to an increasing volume of products liability lawsuits, including those related to asbestos. A controversy began to emerge over the appropriate "trigger" for insurance coverage in claims alleging delayed injuries from long-term exposure. *See*, *e.g.*, *Stonewall Ins. Co. v. Asbestos Claims Management Corp.*, 73 F.3d 1178, 1195-96 (2d Cir. 1995), *modified*, 85 F.3d 49 (2d Cir. 1996)(discussing various trigger theories). However, St. Paul and Lincoln Electric continued the renewal of policies and cooperated in the defense of welding fumes cases. The concerns of the parties respecting the emerging trend of lawsuits ultimately led to an August 1979 meeting to negotiate renewal of coverage.

## 2.    The 1979 Deductible Endorsement and Subsequent Coverage 1979-85

In the August 1979 meeting, the parties discussed issues including control of cases, the "occurrence" date, expenses, the renewal agreement, and premiums. St. Paul insisted upon higher premiums, higher deductibles or cost sharing, or a combination of these. Several policy proposals were discussed, including one for a combined defense-and-indemnity deductible, but the parties never discussed the language of the $25,000 deductible that eventually became part of the 1979 policy. Date of occurrence was a major issue. During the meeting, Lincoln Electric advocated a trigger for the occurrence date that would run "from the day the welder commences welding to [the] day he ceases to be a

necessary application of the statute. Predicate factual determinations will not be disturbed except for an abuse of discretion. The court's attitude must be manifestly unreasonable, arbitrary or unconscionable; mere error of law or of judgment is insufficient to support reversal on appeal.

The Ohio law set forth above leads us to conclude that the district court applied most of the above principles correctly. However, the district court erred[31] when it adopted approach one by utilizing the "time between accrual of the claim and judgment" for the calculation of interest. The district court correctly reasoned that "Lincoln Electric lost access and use of certain funds for the period through December 1997," but it incorrectly determined that accrual before February 1996 was necessary to "fairly and reasonably compensate those losses *flowing from St Paul's breach*."

---

[31]We therefore reject Lincoln Electric's position with respect to this issue. Moreover, we note that although St. Paul advocated the correct result, it was incorrect in suggesting adoption of approach two (instead of approach four) as the rationale for reaching that result.

St. Paul was incorrectly forced to expend or absorb costs related to defense, but both parties were equally responsible for the failure of the double-auditing system to catch the problem. This was not a situation where the insurer had sole access to relevant records or where the insurer was conducting the only auditing. It was not until February 1996 that Lincoln Electric first proffered its complex theory for recovery and demanded a reallocation of defense and indemnity payments. Thus, under the unique facts of this case, the approach two date "when insurer is made aware that the insured disagrees with how insurer has disposed of the claim the insured submitted to the insurer about funds expended by insured in defense efforts" happens to coincide with the second prong of approach four, which is when "the insurer knew or should have known that the insurer was not fulfilling its duty to defend." Since both prongs under approach four must be satisfied, the date of accrual will always be pushed back to the date when the latter of the two prongs has been satisfied. In this case, prong two of approach four produces the same accrual date as approach two.

date for payment, and hence interest accrual, may be from the date coverage was demanded, the date coverage was denied, the date of an accident, or some other date. In the context of this case, interest accrued under R.C. 1343.03(A) on the date at which both A) the insured was incorrectly forced to expend or absorb defense costs, *and* B) the insurer knew or should have known that it was not fulfilling its duty to defend.

3. Mere denial that one is liable for a debt will not make a claim unliquidated[30] and will not defeat a claim for prejudgment interest. Prejudgement interest will not be denied merely because a principal amount is liquidated, unliquidated, or not susceptible to easy ascertainment. Courts do not award interest based upon a lack of good faith in the underlying action, the insurer's decision to defend, and/or the nonmovant's failure to settle. It makes no difference that the claim to be defended was not clearly within the defendant's policy periods. An arbitration award or verdict is not required. Admission or acknowledgment of liability by the defendant insurer is not required.

4. The trial court judge is responsible for identifying the date of accrual. The trial court judge calculates the amount of prejudgment interest. If a favorable judgment award has been obtained by plaintiff, plaintiff has a right under R.C. 1343.03(A) to an interest award as a matter of law, and the trial judge has no discretion not to grant any interest award. Although a trial court judge is bound to apply prejudgment interest principles to the facts as found by the trial factfinder, the judge makes the additional predicate factual determinations needed to support any

---

[30]Even in the case of unliquidated debts, prejudgment interest may be awarded under Ohio law if the amount is capable of ascertainment by mere computation, or is subject to reasonably certain calculations by reference to existing market value.

welder,"[4] while St. Paul countered with a "manifestation date"[5] alternative.[6] St. Paul acknowledged Lincoln Electric's position.[7] Lincoln Electric asserts that no agreement on trigger or date of loss was reached.

No deal of any kind was made at the August 15 meeting. A week later, on August 23, St. Paul sent a letter to Oswald's CEO describing two options[8] for Lincoln Electric, and the substance of the letter was then communicated to Lincoln

---

[4]Lincoln Electric's proposed trigger apparently was a hybrid of the "exposure" trigger, which applies those policies in effect at the time of the exposure to the offending product, and the "continuing injury" trigger, which applies those policies in effect at any time from exposure through manifestation. Lincoln Electric's language suggests a continuing injury trigger that is cut short by the last date at which exposure could have occurred. Under Lincoln Electric's proposal, the concept of exposure would have been used to define the limits of coverage rather than as a justification for the substance of provided coverage.

[5]A traditional "manifestation" trigger applies those policies in effect at the time the injury was manifested.

[6]Lincoln Electric's view is that St. Paul knew it could not avoid the occurrence coverage it had already sold, nor prevent future claims from triggering those policies. Lincoln Electric asserts St. Paul knew if it left Lincoln Electric it could not collect additional premiums to offset losses, thus exacerbating what was already a bad situation for St. Paul.

[7]The position was acknowledged in a memorializing document which stated:

Establishment of Occurrence. Insured wants it to read from the day the welder commences welding to day he ceases to be a welder. This results in limits applying cumulatively during the years we provide coverage.

[8]One option was "a policy excluding welding fume claims," while the other option offered "a policy with a $25,000 combined defense and indemnity deductible for welding fume claims" in return for an additional $548,000 in annual premiums.

Electric.   The letter included the following language (emphasis added):

> On August 21 . . . we quoted to Insured renewal of this policy at current limits with one exception an annual premium of $1,200,000 [sic]. The one exception was the endorsement relating to a *retroactive* deductible on each claim for $25,000.  This is to *apply to all fume cases reported after August 1, 1979.*  Allocated claims expense plus settlements [are] to be included in the deductible.
>
> All other quota share quotes are withdrawn; however, renewal of this policy at current limits, excluding fume cases, still stands at an annual premium of $652,000.
>
> We *recognize the dispute in application of limits and coverage[9] for fumes cases exists.*  In keeping with these issues as *status quo and without prejudice* to either party on this position, the attached endorsement has been *drafted in an effort to clearly indicate our intention on future reported cases if we are to remain with this risk.*
>
> We expect the decision from the Insured concerning renewal with us by September 1, 1979 as we cannot continue current coverage beyond this date.

The parties entered into a new policy, including an endorsement specifying applicable deductibles, and a binder dated September 5, 1979 was issued.  The policy addressed the treatment of future claims as follows:

> IN CONSIDERATION of [St. Paul] agreeing to provide coverage to the Insured [Lincoln Electric] for this policy period, the Insured agrees to pay the following deductible for: Bodily injury liability arising out of inhalation of toxic chemicals, including, but not limited to fumes and gases, which are caused from welding products manufactured, sold, handled, or distributed by the insured

---

[9]According to Lincoln Electric, the "limits and coverage" dispute existed because, under the exposure or continuous trigger of coverage, multiple policies could be triggered by each welding fume claim.

(St. Paul's argument), "that prejudgment interest should only run from February 1996 – the point in time when Lincoln Electric first demanded a reallocation of defense and indemnity payments."  The court adopted approach one even though "[d]efendants had no way of knowing of the claim," and there was a double-auditing procedure in place during the relevant time period to guard against mistakes and fraud.  The court reasoned that "Lincoln Electric lost access and use of certain funds for the period through December 1997," and that the money would "fairly and reasonably compensate those losses *flowing from St Paul's breach.*"

After studying the guidance provided by Ohio law,[29] we conclude that prejudgement interest for this case should be determined in accordance with the following principles:

1.  Prejudgement interest is not punitive; it is part of compensation for damages.  Interest  makes the plaintiff insureds whole for the lost use of their due and payable money during the time required to secure ultimate judgment.

2.  The date for when payment is due from an insurer varies according to circumstances and the nature of the insured interest.  Under a particular fact pattern the due

---

[29]Our synthesis of Ohio precedent is drawn from *Landis v. Grange Mutual Insurance Co.*, 82 Ohio St.3d 339, 340, 695 N.E.2d 1140, 1142 (Ohio 1998); *Royal Electric Construction Corp.*, 73 Ohio St.3d at 115-17, 652 N.E.2d at 691-92; *Dwyer Electric, Inc. v. Confederated Builders, Inc.*, No. 3-98-18, 1998 WL 767442, at *1 (Ohio Ct. App. 1998); *Lovejoy v. Westfield National Insurance Co.*, 116 Ohio App.3d 470, 475-76, 688 N.E.2d 563, 567 (Ohio Ct. App. 1996); *Eagle American Insurance Co.*, 111 Ohio App.3d at 220-22, 675 N.E.2d at 1317-18; *Domestic Linen Supply & Laundry Co.*, 109 Ohio App.3d at 322, 672 N.E.2d at 191; *Outdoor Outfitters, Inc. v. Fireman's Fund Insurance Co.*, 98 Ohio App.3d 733, 736-37, 649 N.E.2d 871, 873 (Ohio Ct. App. 1994); *City of Willoughby Hills v. Cincinnati Insurance Co.*, 26 Ohio App.3d 146, 146-48, 499 N.E.2d 31, 32-34 (Ohio Ct. App. 1986); and *Turner Construction Co. v. Commercial Union Insurance Co.*, 24 Ohio App.3d 1, 4, 492 N.E.2d 836, 839 (Ohio Ct. App. 1985).

law.**27** We now consider how Ohio law**28** applies to the facts at bar.

There are four points in time that courts could use to determine when prejudgment interest should begin to accrue against an insurer who wrongfully fails to defend on a claim against an insured:  1) the date when the insured submitted a claim to the insurer detailing funds expended in defense efforts; 2) the date when the insurer was made aware that the insured disagreed with the insurer's disposition of the defense-cost claim submitted to the insured; 3) the date when the insured filed a legal action against the insurer with a court or arbiter concerning legal costs; or 4) the date when A) the insured has been incorrectly forced to expend or absorb defense costs, *and* B) the insurer knew or should have known that it was not fulfilling its duty to defend.

In this case, the district court apparently adopted approach one, utilizing the "time between accrual of the claim and judgment."   The court explicitly rejected approach two

---

**27**Courts in Ohio have long recognized a common-law right to prejudgment interest, and Ohio has also created an additional statutory right to prejudgment interest. *Cf. Royal Elec. Constr. Corp. v. Ohio State Univ.*, 73 Ohio St.3d 110, 115, 652 N.E.2d 687, 691 (Ohio 1995). Ohio courts have rendered numerous holdings explaining how Ohio prejudgment interest statutes are to be interpreted and reconciled with Ohio common law.

This controversy concerns a plaintiff insured, so the "matter is governed by R.C. 1343.03(A), rather than R.C. 1343.03(C)." *Eagle Am. Ins. Co. v. Frencho*, 111 Ohio App.3d 213, 220, 675 N.E.2d 1312, 1317 (Ohio Ct. App. 1996). The statutory provisions of R.C. 1343.03(A) and 1343.03(C) differ in that "R.C. 1343.03(A) provides for interest on money which [sic] becomes due and payable upon any instrument of writing, including an insurance contract." *Id.* at 220-21.

**28**The statutory language of "R.C. 1343.03(A) does not specify when prejudgment interest should begin to run, when it should stop running, or whether it should run continuously." *Domestic Linen Supply & Laundry Co. v. Kenwood Dealer Group, Inc.*, 109 Ohio App.3d 312, 323, 672 N.E.2d 184, 191 (Ohio Ct. App. 1996).

---

or insured's vendors on *any and all claims first presented to the Company on or after August 1, 1979, regardless of when the claim first arose. . . .* $25,000.00 deductible per claim applicable to the payment of the claim and allocated claims expense.

This same endorsement, providing a $25,000 indemnity-and-defense deductible for all claims reported after August 1, 1979, was included in each policy from 1979 to 1985.  The district court found that by accepting the $25,000 deductible endorsement, Lincoln Electric understood that it would not be waiving any rights under pre-August 1979 policies and the dispute about the trigger of coverage would be resolved by maintaining the "status quo."

St. Paul asserts that from 1979 to 1985 an unwavering course of conduct governed: the post-1979 policies with the $25,000 indemnity-and-defense deductible applied to cases filed after August 1, 1979.  Throughout this period: (1) Lincoln Electric forwarded each welding claim it received to St. Paul; (2) St. Paul paid the defense costs and any indemnity costs; (3) St. Paul submitted a bill to Lincoln Electric for the $25,000 deductible for defense and indemnity costs applicable to claims reported from 1979 to 1985 (only a $5,000 indemnity deductible for cases reported before August 1, 1979), and (4) Lincoln Electric paid St. Paul the amount billed.  Lincoln Electric employed independent auditors to review St. Paul's statements, forwarded them to a law firm retained to conduct continuous review, and corrected any errors it perceived.  St. Paul also asserts that Lincoln Electric knew the claims it submitted alleged exposure before August 1, 1979, and that St. Paul applied the $25,000 deductible to such claims when they involved cases reported to St. Paul after August 1, 1979.  Nonetheless, St. Paul observes, Lincoln Electric did not protest any of the payments. Lincoln Electric has not disputed the existence of the double-auditing scheme, and the parties agree that no protest about St. Paul's conduct was registered during this time period or at any time

prior to a February 22, 1996 letter faxed to St. Paul by Lincoln Electric.

*3.   The 1979 Deductible Endorsement and Subsequent
      Coverage 1985-96*

From 1985 to 1996, the parties changed the policies in two significant respects. First, the new policies required Lincoln Electric to assume a greater payment obligation. The 1985-87 policies provided a $50,000 deductible applicable to both indemnity and defense expense costs for "toxic chemical and fumes" claims; the 1987-90 policies provided a $250,000 self-insured retention applicable to all claims; and the 1990-96 policies provided a $2 million self-insured retention. This approach afforded Lincoln Electric substantially higher overall limits for a lower premium.

Second, the policies provided "claims-made," rather than "occurrence," coverage, meaning that the policies applied to claims made within the policy period, instead of applying to the occurrence of bodily injuries during that policy period, which would culminate in suits initiated after the policy period.   The policies from 1985-87 also included a manifestation endorsement, which limited the applicability of the policies with the higher deductibles and retentions to claims where the manifestation occurred after August 1, 1985:

> The effect of this is to eliminate claims that should be covered under a previous policy. We won't cover claims for injury arising out of inhalation of toxic chemicals, including but not limited to, fumes and gases[,] which are caused by the use of welding products manufactured, sold, handled, or distributed by you or your vendors *if the injury first manifested itself prior to 8/1/85.* The date of manifestation shall be the date the person injured knew or should have known that the injury had occurred or the date [it] was medically diagnosed, whichever is earlier.

The 1987-96 endorsements contained substantially similar language. Unlike the occurrence policies, the possibility of

injury claim allocated to a particular year, so that both the "occurrence-based" and "claims-based" policies are triggered by a claim where the long-term exposure and delayed manifestation injury arose during an "occurrence-based" policy year but the claim for that long-term exposure and delayed manifestation injury was filed during a subsequent "claims-based" policy year, the insured can "pick and choose" between the policies *as to that portion of the liability* which falls within the time-span with the double-protection from overlapping policies.

We remand this case to the district court for further proceedings necessary to apply these  principles, determine whether the base judgment award must be adjusted downwards or upwards, and make any additional required modifications in its resolution of this case.

*6. Date of Accrual for Prejudgment Interest*

St. Paul contends that the district court erred in its interpretation and application of Ohio  prejudgment interest

(which may vary even as to separate individual policies from the same insurer over time) for deductibles, legal costs, and legal defense set forth under each of the policies for each of the policy periods from each of the relevant entities (and/or under one entity and/or under self-insurance). To the extent that joint and several liability and contribution for a particular policy period would normally apply under the law, those doctrines will remain unaltered. However, joint liability and contribution must take into account the effects of the trigger and allocation presumptions.[26]

> 4)   ***For the portion of a claim falling within a time span that is "double-protected" by overlapping "occurrence-based" and "claims-based" policies, the insured is entitled to "pick-and-choose" between policies for the best terms of coverage as to that portion.***

In circumstances where 1) an insurer has replaced an "occurrence-based" policy with a "claims-based" policy, 2) there has been no explicit "buy-back" of the old occurrence-based policy or its liabilities by the insurance company, and 3) there is a discrete claim or a portion of a pro-rated long-term exposure and delayed manifestation

---

[26]In other words, allocation does not preclude application of any joint and several liability doctrine which might otherwise be relevant under Ohio law. Allocation relates to the duties of proof, affirmative defenses, and duties of production connected with proving the existence of liability; in contrast, joint and several liability relates to the distribution of obligations for defendants who are found to share liability. Allocation simply precedes application of the joint and several liability doctrine in the process of liability attribution. If two insurers were found to have valid policies for the same year, and the joint and several liability doctrine validly applied, both insurance companies would be jointly and severally liable for the portion of the long-term exposure and delayed manifestation injury claim which was allocated to the jointly-covered policy period. The application of any principles of contribution otherwise relevant under Ohio law likewise remains unaltered.

any disbursement from the claims-made policies expired at the end of each policy period unless a claim had been filed prior to its expiration.

St. Paul asserts that just as from 1979 to 1985, the parties continued a consistent course of conduct from 1985 to 1996. As to (1) claims reported before 1979, the parties applied a $25,000 deductible to both indemnity and defense costs; (2) claims made after August 1, 1985, with a manifestation before that date, the parties applied the $25,000 deductible in accordance with the manifestation endorsement; and (3) claims made after August 1, 1985, with a manifestation after that date, the parties applied the higher deductibles and self-insured retentions to indemnity and defense costs. The vast majority of underlying claimants alleged manifestation of injury after 1979, with most alleging manifestation after 1984. Throughout this period, St. Paul continued to submit bills for reimbursement to Lincoln Electric, and Lincoln Electric continued to consult with its auditors and attorneys and to pay the sums without protest.

### 4.   *Conflict Between Lincoln Electric and St. Paul Concerning the Contractual Insurance Obligations*

As discussed previously, the pre-1979 insurance coverage was on an "occurrence" basis, meaning the policies covered "bodily injury . . . caused by an occurrence ["an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury . . . neither expected nor intended from the standpoint of the insured"]." A shift was then made to a "claims" basis so that 1979-85 coverage would apply to "any and all claims first presented to the Company on or after August 1, 1979, regardless of when the claim first arose." Finally, after 1985 coverage was further altered to include the proviso that "[St. Paul] won't cover claims for injury arising out of the inhalation of toxic chemicals . . . if [the "person injured knew or should have known that the injury had occurred or the date [it] was medically diagnosed, whichever is earlier" is] prior to

8/1/85." After Lincoln Electric hired new counsel in 1995, sharp differences of view emerged. In the February 22, 1996 faxed letter, Lincoln Electric formally requested reimbursement for monies it believed St. Paul owed it. St. Paul signaled disagreement concerning the significance properly assigned to the three shifting schemes for coverage which had been used over time.[10]

Lincoln Electric informed St. Paul that it believed the pre-1979 policies, with the $5,000 damages-only deductible, should govern any period of exposure in those years, even if the claim was made after the end of the policy term. It contended that the "continuous injury" trigger of coverage should apply. In application, Lincoln Electric's position would have meant that any policy in effect during the period when a claimant alleged exposure could apply, and that policy could then permissibly be the *sole* applicable policy even if exposure was alleged to have extended over many years or even a vaguely delimited number of decades. Lincoln Electric also contended that it would have the right to pick and choose among all triggered policies to select the one with the most favorable terms, rather than allocating losses equitably across all policies. According to Lincoln Electric,

----

[10]It would appear that there were at least four possible theories for determining which insurance policy coverages had been triggered by a claim alleging delayed injuries from long-term exposure: 1) a traditional "manifestation" trigger, applying those policies in effect at the time the injury manifested; 2) an "exposure" trigger, applying those policies in effect at the time of the exposure to the offending product; 3) a "continuing injury" trigger, applying those policies in effect at any time from exposure through manifestation; and 4) an "injury-in-fact" trigger, in which the applicable policies were those in effect at any time actual injury occurred. *See*, *e.g.*, *Stonewall Ins. Co.*, 73 F.3d at 1195-96 (discussing the various trigger theories).

will be allocated equally over all triggered years.[24] In the absence of special weighting considerations, which require additional specific proof, assign an equal fractional percentage of exposure value to each policy period which corresponds to the years of exposure.

*3)   Identify the liable legal entity for each triggered policy governing each year and make a pro-rata allocation of deductibles, legal costs, and legal defense obligations by looking to the terms associated with the relevant triggered policies.*

Identify the legal entities obligated to pay for successful claims that are covered by each of the corresponding policy periods. Unless a policy or group of policies affirmatively and explicitly make assurances about absorbing the entire cost of a long-term exposure and delayed manifestation injury with exposure extending through a time period more extensive than the time period for that individual policy or constituent policy, assign a pro-rata percentage of exposure value to each legal entity based upon the number of corresponding policy periods that the legal entity assumed.[25] Treat that pro-rata percentage under the terms

----

[24]A "continuing injury" trigger applies those policies in effect at any time from exposure through manifestation, while an "injury-in-fact" trigger applies those policies which were in effect at any time when actual injury occurred. In effect, we find that the proper trigger is a hybrid between these two triggers. The hybrid is a "flexible continuing injury" trigger that presumes uniformity of injury probability while allowing "injury-in-fact" evidence to rebut the presumption and constrict the range of the allocation field. The allocation field is potentially constricted by weighting the risk probability distribution and collapsing it down to a short time span or even a precise moment of injury.

[25]With respect to legal defense costs, the insurer bears the burden of demonstrating that the costs it expended pursuant to a duty to defend were unduly disproportionate to the allocated portion of the claim that was assigned to the insurer's particular policy with the triggered duty to defend.

exposure and delayed manifestation injuries by incorporating a specific and articulated method of trigger and calculation. In the absence of clear guidance from the terms of the contract concerning long-term exposure and delayed manifestation injuries, there is a rebuttable presumption that all exposure prior to diagnosis contributed equally to an injury-in-fact; thus, all policies in effect at the time of both exposure to the offending product and actual manifestation will be construed to have been triggered.

**2)   *Match the alleged years of exposure to corresponding periods covered by triggered policies.***

Identify all years of exposure alleged to have occurred in a lawsuit, and then identify the corresponding policy periods (including periods where the insured decided to "go bare" with self-insurance). Determine whether special weighting considerations exist because 1) a specific "critical transformation" point was alleged (i.e. where the plaintiff clearly went from total wellness to clear contraction of infirmity in a discrete temporal moment of injurious transformation[21]), or 2) non-uniform levels of exposure[22] were alleged.[23] When the policyholder cannot demonstrate a discrete temporal moment of injurious transformation prior to or contemporaneous with the diagnosis, due to complex medical facts, the presumption is that the injury

---

[21]This would occur if, for example, there was harmful exposure at a level of 20 units for ten years, but on the 11th year an accidental exposure at 100 units in one day resulted in clear symptoms of a disease two days later.

[22]This would occur if, for example, there was five years of 20-unit magnitude of exposure and one year of 100-unit exposure.

[23]On remand, both parties should be given an opportunity to allege facts substantiating the need for special weighting considerations.

St. Paul admitted that a claim could trigger both an occurrence policy and a claims-made policy.[11]

St. Paul believes that Lincoln Electric's interpretation is incorrect because of (1) the sweeping language of the deductible endorsements (which applied to "any and all claims" presented after a particular date "regardless of when the claim first arose") and (2) the parties' consistent conduct for the prior seventeen years. St. Paul contends that Lincoln Electric was well aware of the pertinent facts at all relevant times; Lincoln Electric's letter explicitly stated that the request for the refund was based solely upon a change in Lincoln Electric's legal position on the matter. Additionally, St. Paul argues it is self-evident that it could have stopped insuring Lincoln Electric. St. Paul asserts that the increase in Lincoln Electric's deductibles and retentions meant that there was a division of obligations: (1) Lincoln Electric would pay an increased amount of defense costs for its aggressive no-settlements defense strategy, and (2) St. Paul would continue to insure Lincoln Electric. Now that Lincoln Electric has successfully avoided paying judgments in the lawsuits, St. Paul complains, Lincoln Electric does not need St. Paul's prospective coverage and is attempting to use this litigation to shift the payments it made for its defense onto St. Paul.

**5.   *The District Court Decision***

The district court, following a two-week bench trial, made voluminous findings of fact and conclusions of law. It awarded Lincoln Electric $36.5 million in relief, allowing actual damages, prejudgment interest, and additional declaratory relief. The court denied an award of attorney's fees. The district court made six determinations of major significance for this appeal:

---

[11]The illustration Lincoln Electric uses is that a 1986 claim that a plaintiff was injured in 1978 would trigger both the 1978 occurrence policy and the 1986 claims-made policy.

1)  A "continuous trigger" applied to the term "occurrence," and any policy in effect from exposure to diagnosis or death was applicable to the claim.

2)  The post-1979 endorsements did not control the disposition of claims filed after August 1, 1979, but instead the pre-1979 policies were applicable because they were not modified by the post-1979 endorsements. This was due to the plain language of the endorsements, and "[e]ven if the endorsements were susceptible [to] St. Paul's interpretation" St. Paul had not "proved that its interpretation is the only reasonable one."

3)  St. Paul breached the policies by implementing a trigger "that was to its benefit and to the detriment of Lincoln Electric, while at the same time not disclosing to Lincoln Electric other potential triggers of coverage." At the same time, St. Paul had not breached a duty of good faith because it acted with "reasonable justification" in its treatment of Lincoln Electric's claims.

4)  Lincoln Electric could choose and apply the most favorable policy from all those triggered by a particular claim, rather than allocating the costs equitably among all triggered policies. In practical terms, this meant that the court was allowing Lincoln Electric to apply, to the extent possible, all claims under the 1973 policy, because 1973 was the earliest year for which Lincoln Electric could produce an insurance policy and show yearly policy terms granting a favorable $5,000 indemnity-only deductible. The district court's analysis resulted in $23,537,313 in damages for Lincoln Electric, nearly $21 million of which was attributable to legal defense costs.

5)  Prejudgment interest was calculated to accrue from the time when Lincoln Electric made payments to St. Paul, seventeen years prior to the judgment, instead of from the date Lincoln Electric challenged the payments in the February 1996 letter to St. Paul. The interest award

## 1)  *Determine what kind of trigger applies.*

The face of the contract governs where the policy terms unambiguously[20] contemplate coverage of long-term

---

[20] "All claims" language on the face of the policy is not dispositive and does not inherently preclude or resolve possible ambiguity. "All claims" language in a policy means "all claims" legally deemed to have triggered a policy under its policy period occurrence language. Policy language concerning the qualitative dimensions of the risk of loss must be construed together with other policy language setting forth temporal dimensions of the risk of loss, along with any contractual or legal guidelines governing reconciliation of multiple sources for policy outlays.

Long-term exposure and delayed manifestation injury claims trigger individual policies by virtue of a legal presumption. The presumption allows insureds to avoid the arduous task of proving a discrete temporal moment of injurious transformation in order to prove there was a recoverable injury. Since a legal presumption must be utilized in order to recognize any trigger of the policy whatsoever, the trigger is activated by operation of law only with respect to the risk of loss that is circumscribed by the qualitative and temporal limits set forth in the policy. If, instead of relying upon the benefit of a legal presumption regarding trigger, Lincoln Electric chose to offer direct proof that all (or a disproportionate portion) of the long-term exposure and delayed manifestation injuries occurred during one policy period (e.g., 1973), Lincoln Electric could on that basis allocate more of the risk of loss to that particular policy. Under this option, Lincoln Electric would be free of the constraints concerning allocation which attend use of the legal presumption to trigger the policies. Likewise, since the "[t]he insurer's liability is not 'joint and several', it is individual and proportionate," *Forty-Eight Insulations*, 633 F.2d at 1225, any insurer in St. Paul's position is free to rebut the default presumption by offering specific proof that the risk of loss should be allocated away from certain policies because injury should be properly weighted to other time periods outside those policies.

The principles explained are reached through a set of rebuttable presumptions which relate to duties of proof, proof of affirmative defenses, and duties of production. *See id.* at 1222. Either the insurer or the insured may compel "conventional" insurance law treatment of long-term exposure and delayed manifestation injury claims by forgoing the use of rebuttable presumptions and undertaking the necessary effort and costs needed. Theories of coverage and allocation should "parallel the theory of liability," *id.* at 1218, 1224-25, in order to assure that neither the insurer nor the insured may have their proverbial cake and eat it too.

implementing a trigger "that was to its benefit and to the detriment of Lincoln Electric, while at the same time not disclosing to Lincoln Electric other potential triggers of coverage."   The district court further held that Lincoln Electric could choose and apply the most favorable policy from all those triggered by a particular claim, rather than allocating the costs equitably among all triggered policies. In practical terms, that meant Lincoln Electric would be allowed to apply claims to the 1973 policy whenever possible, because 1973 was the year when it enjoyed a favorable $5,000 indemnity-only deductible.   The district court's analysis resulted in $23,537,313 in damages for Lincoln Electric, nearly $21 million of which was attributable to legal defense costs.

We are persuaded that the Ohio Supreme Court would adopt principles in harmony with the compelling rationale articulated in *Forty-Eight Insulations*, 633 F.2d at 1222, 1224-25 (Michigan law).  The district court's holding in this case ran contrary not only to *Forty-Eight Insulations*, but also to the deference accorded in that opinion to the basic principles undergirding the product-liability insurance market, such as risk calculation, risk management, and bargained-for-exchange.  Consistent with the rationale of *Forty-Eight Insulations*, the district court on remand should apply the following general principles in resolving the dispute at bar:

increased the judgment by more than fifty percent of the base award, at an exact amount (after the district court lowered the amount by $471 to conform with a statutory amendment) of $12,993,367.

6)    The district court rejected Lincoln Electric's request for attorney's fees.

## II.

1.    *Standard of Review and Ohio Law Concerning Contract Interpretation*

"We review for clear error the findings of fact made by the district court after a bench trial; the court's legal conclusions we review *de novo*." *Davies v. Centennial Life Ins. Co.*, 128 F.3d 934, 938 (6th Cir. 1997).  The district court's application of state law is reviewed *de novo*. *Leavitt v. Jane L.*, 518 U.S. 137, 145 (1996); *International Ins. Co. v. Stonewall Ins. Co.*, 86 F.3d 601, 604 (6th Cir. 1996).

"Generally, contract terms are to be given their ordinary meaning. . . . When the terms of the contract are clear on their face, the court has no need to construe the evidence otherwise. . . . Parol evidence is admissible only if the terms of the contract are ambiguous and then only to interpret, but not to contradict, the express language." *Ohio Historical Soc'y v. General Maintenance & Eng'g Co.*, 65 Ohio App.3d 139, 146, 583 N.E.2d 340, 344 (Ohio Ct. App. 1989). "The question of whether the language of a written agreement is ambiguous [i.e., requires extrinsic evidence in addition to the language within the four corners of the document to ascertain contract meaning] is one of law."[12] *Parrett v. American Ship*

---

[12]Extrinsic evidence can become a consideration *before* an ambiguity has been identified from the face of the contract as a matter of law, in the limited sense that such evidence can assist the court in determining whether, as a matter of law, two plausible interpretations exist in the manner necessary to give rise to the *existence* of an ambiguity. *Key v.*

*Bldg. Co.*, 990 F.2d 854, 858 (6th Cir. 1993)(Ohio law); *Ohio Historical Soc'y*, 65 Ohio App.3d at 146, 583 N.E.2d at 344. "If a contract is clear and unambiguous . . . there is no issue of fact to be determined." *Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio*, 15 Ohio St.3d 321, 474 N.E.2d 271, 272-73 (Ohio 1984)(per curiam). "However, the interpretation of such language, once held to be ambiguous, is a factual issue turning on the intent of the parties." *Parrett*,

---

*Allstate Ins. Co.*, 90 F.3d 1546, 1548-49 (11th Cir. 1996)(Florida law)(emphasis added)("Under ordinary principals of contract interpretation, a court must first examine the natural and plain meaning of a policy's language. . . . [U]nless and ambiguity exists, a court should not resort to outside evidence or the complex rules of construction to *construe* the contract. . . . Moreover, in determining whether a contract is ambiguous, the words should be given their *natural, ordinary meaning*, . . . and ambiguity does not exist simply because a contract requires interpretation or fails to define a term . . . . If, on the other hand, a court determines that the terms of an insurance contract are ambiguous, *or otherwise not susceptible to a reasonable construction*, a court may look beyond the contractual language to discern the intent of the parties in making the agreement. In general, ambiguities in contracts are construed against their drafters."); *Press Mach. Corp. v. Smith R.P.M. Corp.*, 727 F.2d 781, 784-85 (8th Cir. 1984)(Missouri law)(emphasis added)("In determining whether a contract is ambiguous, the court must consider the whole instrument and the *natural and ordinary meaning* of the language. . . . [T]he court's role is to determine the intention as manifested . . . by the document. In that inquiry, however, the court is justified in considering *more than the mere words of the contract*. The *surrounding circumstances* at the time of contracting and the *positions and actions of the parties* are relevant to the judicial interpretation of the contract.").
     Obviously, the natural and ordinary meaning of language, reasonable construction of a contract, surrounding circumstances, and positions and actions of the parties are issues that cannot be weighed in a vacuum. *See Bunnell Med. Clinic, P.A. v. Barrera*, 419 So.2d 681, 683 (Fla. Dist. Ct. App. 1982)(emphasis added)("A latent ambiguity has been defined as one where the language in a contract is clear and intelligible and suggests a single meaning, but *some extrinsic fact or extraneous evidence creates a need for interpretation or a choice* between two possible meanings . . . [and extrinsic evidence becomes] admissible to show the intent of the parties"). Thus, the district court may take cognizance of extrinsic evidence in order to determine whether a factfinder need consider parol evidence in construing the contract.

5.   *Reconciliation of the Contractual Policy Relationship with Long-Term Exposure, Delayed Manifestation Type of Claim*

The most complex question in this case, of course, involves how the unique characteristics of long-term exposure and delayed manifestation injury claims can be reconciled with the various coverage provisions that emerged during the long-standing contractual insurance relationship between the parties. The question encompasses several component issues: 1) what kind of "trigger" applies for the policies covering welding-fumes claims; 2) what impact does the switch from "occurrence" to "claims" policies have in light of the "status quo" preservation of positions between the parties as to the type of trigger; 3) how should a claim be handled if it occurred during the time-span of the "occurrence-based" policy, but then was filed as a claim against the insured during a subsequently active "claims-based" policy; 4) as a general proposition, what relationship exists between various insurers, different policies from the same insurer, and self-insurers over time with respect to a single long-term exposure and delayed manifestation injury claim; and 5) when is an insured allowed to "pick and choose" among terms of different policies in circumstances where those multiple policies are triggered by a long-term exposure claim.

Ohio law provides no dispositive guidance on these issues. Ohio law is very sketchy even with respect to the component issues just mentioned. In this case, we are faced with the additional task of reconciling the overall calculation scheme in a cohesive fashion, and no Ohio statute or Ohio Supreme Court decision squarely addresses the question. *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).

As stated earlier, the district court held that the post-1979 endorsements did not control the disposition of claims filed after August 1, 1979, but instead the pre-1979 policies were applicable because they were not modified by the post-1979 endorsements. St. Paul breached the policies by

### 4.   *Standard of Evidence Required for Proving the Existence and Terms of Alleged "Missing" Insurance Policies*

The district court cited three federal district court decisions from other circuits, each dealing with non-Ohio law, in support of its conclusion that a preponderance of the evidence standard should be used to determine whether Lincoln Electric had carried its burden to prove the existence and terms of the alleged "lost" insurance policies covering the years from 1945 to 1972.  The court then found  sufficient evidence to meet the preponderance of the evidence standard. St. Paul challenges both the standard used and the nature of the evidence employed by contending that the standard should be clear and convincing evidence and impermissible evidence was considered.

A perusal of the various cases cited by the parties and the district court verifies that there is no dispositive statute or Ohio Supreme Court case on point.  However, the district court did adopt a standard that makes practical sense, appears to represent the majority rule, and can be said to reasonably anticipate the Ohio Supreme Court's position. Two cases that deal with Ohio law appear to be in accord with the district court's holding: *Miller v. MIF Realty L.P. (In re Perrysburg Marketplace Co.)*, 208 B.R. 148, 158 (N.D. Ohio 1997), and *Household Finance Corp. v. Johnson*, 56 Ohio App.2d 14, 15, 381 N.E.2d 215, 216 (Ohio Ct. App. 1978).

We conclude that the district court correctly relied upon the preponderance of the evidence standard.  When that standard is applied we are unable to say that the district court's factual finding in support of the "missing policies" was clearly erroneous.

990 F.2d at 858; *Ohio Historical Soc'y*, 65 Ohio App.3d at 146, 583 N.E.2d at 344. "The meaning of [ambiguous] terms . . . will not be overturned on appeal absent a showing that the trial court abused its discretion."  *Id.* at 147.

As to the scrutiny applied to a district court's application of the parol evidence rule under Ohio law, this court has previously noted, *Construction Interior Sys., Inc. v. Marriott Family Restaurants, Inc.*, 984 F.2d 749, 754 (6th Cir. 1993), that:

> [w]here the parties, following negotiations, make mutual promises which thereafter are integrated into an unambiguous written contract, duly signed by them, courts will give effect to the parties' expressed intentions. . . . Intentions not expressed in the writing are deemed to have no existence and may not be shown by parol evidence. . . . Even where a contract is not fully integrated, parol evidence cannot be admitted if its effect will be to vary or contradict any matter that is specifically covered by the written terms of the contract. . . . There can be no implied promises in a contract in relation to any matter that is specifically covered by the written terms of the contract . . . Interpretation of written contract terms is a matter of law for initial determination by the court, . . . the job of interpretation is turned over to the fact finder [only when the relevant contract language is determined by the judge to be ambiguous.]

Finally, should this court determine that the contract in this case involved an ambiguity, it should be mindful of a final principle of Ohio law:

> In interpreting the contract herein, the additional terms supersede the original terms to the extent the two are contradictory.  If the additional terms are ambiguous, then we are to give effect to the additional terms but we are to interpret them consistently with the original terms to the extent possible. . . .  Accordingly, our construction

of the contract should attempt to harmonize all the provisions rather than produce conflict in them. . . . To that end, no provision of the contract should be ignored as inconsistent if there exists a reasonable interpretation which [sic] gives effect to both. . . . Moreover, to the extent we encounter an ambiguity in the contract, that ambiguity must be construed against the drafting party.

*Ottery v. Bland*, 42 Ohio App.3d 85, 87, 536 N.E.2d 651, 654 (Ohio Ct. App. 1987); *see also McKay Mach. Co. v. Rodman*, 11 Ohio St.2d 77, 79, 228 N.E.2d 304, 307 (Ohio 1967); *Franck v. Railway Exp. Agency, Inc.*, 159 Ohio St. 343, 345-46, 112 N.E.2d 381, 383 (Ohio 1953).

The above principles underscore the need for this court to reach an initial determination regarding whether there was ambiguity in the original written policy. We conclude that there was no ambiguity.[13] As a consequence, this court must scrutinize most of the district court's disposition of this case as a question of law under the *de novo* standard. To the extent that material facts for this case must be derived from findings of the district court, we rely upon those findings of fact because we are unable to say that the court committed clear error. Aside from the errors specifically identified in this opinion, we also cannot say that the district court committed legal error.

---

[13]This dispute between the parties did not arise because there was objective latent uncertainty at the time of contract formation with respect to the inherent meaning of words used to express the agreement. Rather, this dispute centers upon how the law should apply to a contract with clear meaning that has proven inadequate in the context of environmental change. *See Insurance Co. of N. Am. v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1217, 1219 (6th Cir. 1980). The policies were internally unambiguous when viewed through the lens of original expectations and the scheme the parties believed they were creating. In hindsight, however, the policies now reveal the fact that, at the time of the early policy agreements, neither party contemplated their future encounter with long-term exposure and delayed manifestation injury claims.

district court seemed to find that Lincoln Electric's acquiescence to St. Paul's processing of the claims was attributable to a lack of awareness rather than to a conscious manifestation of implicit approval concerning execution of the contract. The district court implicitly found that Ohio's voluntary payment and mistake of law doctrine did not apply because Lincoln Electric's payments did not carry the fully-informed consent necessary to constitute "voluntary" payment. The district court also found there was no "buy back" of Lincoln Electric's policies by St. Paul. The district court was not clearly erroneous[18] in its interpretation of the evidence concerning the relationship[19] between the parties. Thus, we cannot overrule the district court's resultant refusal to adopt St. Paul's version of an alleged course of conduct and to apply the voluntary payment and mistake of law doctrine. St. Paul remains liable for failing to adhere to the terms of policies held by the Lincoln Electric.

---

[18]St. Paul points out that there was evidence the district court could have used to find for its version of the facts. However, the court did not commit clear error because its interpretation of the evidence is plausible.

[19]For example, we do not disturb the district court's conclusion, on its findings of fact or law, that post-August 1979 $25,000 deductibles did not purport to eliminate coverage under pre-August 1979 policies, and that the post-1979 deductibles were ineffective to exclude or restrict coverage. The August 1979 to August 1980 policy deductible did not exclude coverage for welding fume claims under *all* earlier accident and occurrence policies. The endorsement itself stated it would apply only to the policy to which it was attached; it mentions no other policies. Further, each pre-August 1979 policy required that any changes be made only by "endorsement issued to form a part of [each] policy." Once policies were sold, the insurer could not alter them without buying them back. St. Paul has never even alleged that they purchased the policies back with a *quid pro quo* monetary exchange. The district court apparently found that St. Paul never purchased the old policies back.

A valid "written changes only" provision preempts consideration of course of performance. In contrast, course of conduct can be considered in certain respects notwithstanding a "written changes only" contractual provision, because the series of acts in question are evaluated only as evidence regarding a continuity of the purpose captured by the original contractual terms at the time of formation.[16]   Contrary to Lincoln Electric's assertions, it was within the province of the district court to consider course of conduct evidence to divine the parties' intent.

St. Paul's theory that it is free of liability nonetheless falls short, because St. Paul fails to acknowledge that a course of conduct analysis rests upon preliminary conclusions which are predicated upon preliminary factual determinations.[17]   The district court was free to ascertain whether a course of conduct existed.  If the court found there was a course of conduct, it had the prerogative to decide whether it evidenced specific contractual intent suggesting the existence of a contractual ambiguity, and/or fully-informed consent and voluntary payment by Lincoln Electric.

Apparently the district court did not find the series of acts in this case sufficient to compel the interpretation of contractual intent and meaning that St. Paul advocates. The

---

[16]Consideration of a course of conduct is permissible because silence can sometimes reflect the contracting parties' contemporaneous belief that the original contract terms are being honored.  *Cf. United States v. Hoosier*, 542 F.2d 687 (6th Cir. 1976)(per curiam)(silence as an admissible party admission under FED. R. EVID. 801(d)(2)(B)).  The existence of such a contemporaneous belief would suggest a particular contract meaning.  That meaning, in turn, would preclude the existence of an ambiguity and/or clarify a facially ambiguous term.

[17]Since a course of conduct is "a series of *acts* over a period of time, however short, *evidencing* a continuity of *purpose*," *cf. Leydon*, 260 Cal. Rptr. at 254 (emphasis added), it is clear that the impact of a course of conduct can be identified only after a factfinder determines from the evidence what acts took place and what purpose accompanied those acts.

---

2.   *Preservation of Issues in District Court for Subsequent Appeal*

Lincoln Electric suggests that St. Paul's "voluntary payment" and "equitable allocation"[14] arguments have been forfeited because they were not argued to the district court prior to its judgment.  We are unpersuaded.  Our examination of the motions, the district court opinion, and the briefs suggests that all issues in the appeal of this complex matter have been properly raised.  All of the various points of operative fact were raised before the district court, and the parties were sufficiently thorough in proffering to the district court their concerns, differences of opinion, preferred sources of precedent, recommendations for interpretations of law and fact, and positions regarding the proper award.

3.   *Existence of St. Paul's Liability Towards Lincoln Electric for Non-Compliance with Policy Terms: Reconciliation of Doctrines Concerning Course of Conduct, Written Changes Only Provisions, Policy Buy-Back, and the Voluntary Payment/Mistake of Law Doctrine*

As an initial proposition, St. Paul asserts that the district court erred in finding that it had any liability whatsoever.  St. Paul believes that an understanding reached with respect to any and all claims filed after August 1, 1979 dictated that the post-1979 endorsements controlled the disposition of claims filed after August 1, 1979.  St. Paul notes that 1) from 1979-1996, Lincoln Electric forwarded to St. Paul thousands of claims that included allegations of exposure before 1979; 2) from 1979-1996, with respect to those claims, St. Paul applied post-1979 deductibles and retentions; and 3) from 1979-1996, for those claims, Lincoln paid the post-1979 deductibles and retentions.

---

[14]"Equitable allocation" is also known as "horizontal allocation."

St. Paul contends that a seventeen-year course of conduct of payment without protest should bar Lincoln Electric's request for a refund. According to St. Paul, the Ohio voluntary payment and mistake of law doctrine prevents Lincoln Electric from attempting to recover voluntary payments on a policy on the basis of a claimed mistake of law, a new legal position, or a new construction of a contract. St. Paul characterizes Lincoln Electric's February 22, 1996 letter concerning the multiple trigger theory as being disallowed under Ohio law. In response, Lincoln Electric asserts that St. Paul never purchased the old policies back from Lincoln Electric. It argues that it continues to enjoy that coverage because no consideration supported any alleged agreement to rescind coverage from the older policy terms.

We are considering an insurance policy scheme that was 1) negotiated between entities with sophisticated business expertise and resources, and 2) implemented under continuous monitoring by two separate teams of auditors and counsel acting for each party. Given this context, St. Paul correctly invokes the proposition that "[w]here a course of conduct removes an ambiguity in the written terms of an agreement, the rule of practical construction should take precedence over the rule that a contract of insurance is construed against its drafter." *William C. Roney & Co. v. Federal Ins. Co.*, 674 F.2d 587, 590 (6th Cir. 1982). A course of conduct illuminates the specific nature of the relationship between the parties, resolving questions concerning the existence of ambiguity and thus obviating the need to resort to defaults provided by the general rules of contract construction. *Id.*

Lincoln Electric counters that the course of dealing between the parties cannot be considered in reaching a resolution of this case, because all of the policies in question before and after 1979 included "written changes only" provisions. Lincoln Electric's position implicitly confuses "course of

conduct" with "course of performance."[15] "Course of performance" is defined as "[t]he *understandings* of performance which *develop* by conduct without objection between two parties *during the performance* of an executory contract." BLACK'S LAW DICTIONARY 352 (6th ed. 1990) (emphasis added); *cf.* U.C.C. § 2-208(1) (1994). "Course of conduct," in contrast, is generally understood to denote "a series of acts over a period of time, however short, *evidencing a continuity of purpose*." *Cf. Leydon v. Alexander*, 212 Cal. App.3d 1, 4, 260 Cal. Rptr. 253, 254 (Cal. Ct. App. 1989)(quoting California statutory definition)(emphasis added).

---

[15]"Course of performance" and "course of conduct" are terms distinct in modern usage not only from each other, but from the term "course of dealing." U.C.C. § 2-208(2), 2-309 cmts. 1, 5 (1994). "Course of dealing" denotes "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." U.C.C. § 1-205(1) (1994). Thus, course of dealing concerns some aspects of the portion of a total course of conduct which might happen to have existed previous to or contemporaneous with initial contract formation (a course of conduct may conceivably extend from a time previous to initial contract formation to a time subsequent to contract formation). *Cf.* U.C.C. § 2-309 cmt. 5 (1994). "Course of dealing" and "course of performance" are defined with reference to the moment of initial contract formation, and thus they cannot overlap with each other but can overlap with the course of conduct. Of course, when there is a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein, courts must generally look to see if state law forbids having such terms "contradicted by evidence of any prior agreement or of a contemporaneous oral agreement." *Cf.* U.C.C. § 2-202 (1994). The parol evidence rule concerns attempts to modify, alter, or supplement a written contract, using evidence of operative facts in existence before or during contract formation. With many types of contracts the course of dealing may be considered even when the parol evidence rule is found to apply. U.C.C. § 2-202(a) (1994).

In this case, we have not been pointed to any part of the record suggesting that the district court took account of a course of performance or course of dealing instead of considering the possibility of a course of conduct. Thus, we need not reach any further discussion concerning the relationship between course of conduct and the parol evidence rule.