RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0332p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

In re AMTRUST FINANCIAL CORPORATION,
       *Debtor.*
_____

FEDERAL DEPOSIT INSURANCE CORPORATION,
       *Appellant*,

  *v.*

AMTRUST FINANCIAL CORPORATION,
       *Appellee.*

No. 11-3677

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:10-cv-1298—Donald C. Nugent, District Judge.

Argued: May 31, 2012

Decided and Filed: September 14, 2012

Before: MARTIN and DAUGHTREY, Circuit Judges; MALONEY, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Minodora D. Vancea, FEDERAL DEPOSIT INSURANCE CORPORATION, Arlington, Virginia, for Appellant. Pierre H. Bergeron, SQUIRE SANDERS & DEMPSEY (US) LLP, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Minodora D. Vancea, Michelle Ognibene, FEDERAL DEPOSIT INSURANCE CORPORATION, Arlington, Virginia, for Appellant. Pierre H. Bergeron, Stephen D. Lerner, Robert A. Amicone, II, SQUIRE, SANDERS & DEMPSEY (US) LLP, Cincinnati, Ohio, Richard S. Gurbst, Philip M. Oliss, SQUIRE, SANDERS & DEMPSEY (US) LLP, Cleveland, Ohio, for Appellee.

_____

[*] The Honorable Paul Lewis Maloney, Chief United States District Judge for the Western District of Michigan, sitting by designation.

———————

**OPINION**

———————

PAUL L. MALONEY, Chief District Judge.   When AmTrust Financial Corporation ("AFC") filed for bankruptcy in late 2009, the FDIC was appointed receiver for AFC's subsidiary, AmTrust Bank ("the Bank").   In that capacity, the FDIC sought payment from AFC under 11 U.S.C. § 365(o), which requires that a party seeking Chapter-11 bankruptcy fulfill "any commitment . . . to maintain the capital of an insured depository institution."   The FDIC argued that AFC made such a commitment by agreeing to entry of a cease-and-desist order requiring AFC's board to "ensure that [the Bank] complies" with the Bank's own obligation to "have and maintain" capital ratios of 7 percent (Tier 1) and 12 percent (total).   The district court first denied the parties' cross-motions for summary judgment, finding that the cease-and-desist order was ambiguous, and then, after an advisory-jury trial, found that the order was not a capital-maintenance commitment under section 365(o).   The FDIC appeals both rulings.

For the reasons discussed below, we affirm the district court, both in its ruling that the cease-and-desist order is ambiguous and in its ultimate finding that the order does not contain a capital-maintenance commitment.

BACKGROUND

A.    **Summer – Fall 2008: Deteriorating Assets and Initial Remediation Plans**

During the events leading up to this suit, both AmTrust Bank and its parent and holding company, Appellee AmTrust Financial Corporation, operated under the regulation of the Office of Thrift Supervision ("OTS").  Before it was merged into other federal agencies in late 2011, OTS served as the primary regulator for savings associations and their holding companies.  OTS was tasked with enforcing various provisions of federal law, including the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811 *et seq.*, and the Home Owner's Loan Act, 12 U.S.C. §§ 1461 *et seq.*  In doing

so, it was authorized to examine regulated entities and issue cease-and-desist orders obligating them to stop unsafe or unsound practices and to take steps to fix any resulting problems. *See* 12 U.S.C. §§ 1464(d)(1)(B)(I), 1464(d)(6), 1467a(b)(4), 1818(b)(1), (b)(3) (2006) (amended 2010); 12 C.F.R. § 563.170 (2012).

Though the Bank's troubles date further back, the facts relevant to this suit began in June 2008, when OTS released the findings from its latest examination of AFC and the Bank. Though AFC rated "Satisfactory," the Bank's rating sunk to a "3" on OTS's 1–5 scale—down from the "2" it had received in previous years. The Bank's assets—mainly home mortgages and loans to real estate developers—had been performing badly as the real estate market crashed, and OTS projected "further deterioration" and "significant" risk in the Bank's future. Relatedly, OTS had concerns about the Bank's capital levels. Though the Bank was a "well capitalized" institution by the regulatory absolute scale, OTS felt that the Bank's capital levels were actually only "marginal" when compared to the Bank's "high level of problem assets."

After the examination report issued, the Bank agreed to create a three-year business plan that included, among other things, "detailed capital preservation and enhancement strategies with date specific narrative goals, which shall result in the raising of new equity and a capital infusion by no later than September 30, 2008." The Bank submitted this plan to OTS shortly thereafter, along with a joint AFC–Bank "Management Action Plan" and an AFC-approved "Capital Management Policy." The Management Action Plan frankly laid out the Bank's troubles. "As a thrift, [the Bank's] loan portfolio has always been secured almost 100% by residential real estate," and when the real estate market slowed in late 2006 and early 2007, the Bank's financial condition took a hit as well. In particular, the Bank was suffering because it held a large number of high-risk loans. Approximately half of the Bank's mortgage portfolio was made up of so-called "low-documentation" loans, and almost 60% of the bank's loans involved property in the particularly troubled states of California, Florida, Nevada, Massachusetts, Arizona, and Michigan. Further, the Bank's "A-Minus" loan program

was showing spectacular losses—over 30% of the loans in this program were past due, and over 20% were more than three months past due.

As a bulwark against these troubles, AFC stated, it intended "to maintain capital levels in excess of 'well capitalized' benchmarks." It noted that "management is in the middle of a capital raising exercise which is intended to raise sufficient additional capital to meet both its quantitative and qualitative capital objectives." In particular, AFC planned to issue stock and contribute $240 million of the proceeds to the Bank by September 30, 2008. At the same time, the Bank would both reduce its assets to help limit its total risk and apply over $300 million of its next two years' earnings toward its capital. This combination of strategies, the Bank projected, would increase its capital ratios significantly.

### B.       November 2008: Cease-and-Desist Orders Issue

AFC's capital-raising plan fell through, however, and it did not contribute the expected $240 million to the Bank. At the same time, the Bank's loan portfolio "further deteriorated," leading OTS to downgrade the Bank to a "4" rating on September 30. This rating placed the Bank in "Troubled Condition" per 12 C.F.R. § 563.555 and put various restrictions on its management practices.

On November 19, 2008, OTS presented both AFC and the Bank with proposed cease-and-desist orders ("C&Ds") intended to "formalize the above 'troubled condition' provisions" and to further restrict their operations. The C&Ds were premised, at least in part, on the failures of AFC and the Bank to "meet the specific capital enhancement and preservation requirements contained within [their] business plan," and the orders contained provisions aimed specifically at remedying those failures. The Bank's C&D required, among other things, that it "have and maintain"—"by no later than December 31, 2008, and at all times thereafter"—"(I) a Tier 1 (Core) Capital Ratio of at least seven percent (7%) and (ii) a Total Risk-Based Capital Ratio of at least twelve percent (12%)." AFC's C&D required "the Holding Company" to submit for approval "a detailed capital plan" to attain and hold the Bank's required capital ratios, and it required that AFC's

"Board . . . ensure that [the Bank] complies with all of the terms of its Order to Cease and Desist."[1]

Rather than fight the orders in administrative hearings, both entities' boards agreed to stipulate to their issuance.

### C.     December 2008: Noteholder Dispute

Shortly after the C&Ds issued, AFC received a letter from some of its noteholders claiming that AFC had violated its Note Purchase Agreement with them by not keeping sufficient capital in the Bank. The noteholders also argued, however, that AFC would further breach the agreement if it sold assets and transferred the proceeds to the Bank to improve its capital ratios (as the noteholders believed AFC was considering).

This warning concerned AFC's board. At the next meeting, the board members discussed whether AFC should bring a declaratory judgment action to clear up the "possible conflict between OTS requirements for capital infusion for [the] Bank and Senior Noteholder demands that [AFC] retain its assets." In a later meeting, one board member "pointed out that [OTS] may not look favorably upon the restrictions that the Senior Noteholders want and that there will be a delicate balance between what the OTS wants in terms of strengthening the Bank and what the Senior Noteholders want in terms of keeping [AFC] strong." The board would discuss these issues with the noteholders through the winter and into 2009.

### D.     Winter 2008 – Summer 2009: The Bank's Risk Reduction Plan and OTS's Compliance Report

The Bank failed to satisfy the C&D's capital-ratio requirements by the December 31, 2008 deadline. As OTS found in its next examination report, instead of a 7% Tier 1 (Core) Capital Ratio and a 12% Total Risk-Based Capital Ratio, the Bank managed only 4.95% and 9.99%, respectively. For this reason, OTS stated, "the holding company

---

[1]The meaning of this clause is the primary question before this court today.

and bank were not in compliance" with paragraph 4(a) of AFC's C&D. Similarly, "the holding company and the bank" failed paragraph 8, as they "were not in compliance with the minimum capital requirements of paragraph 4.a. of [AFC's] C&D at December 31, 2008."

OTS gave both AFC and the Bank "4" ratings overall, testifying to the Bank's continued poor performance. The report noted that AFC "contributed nearly $6 million of capital into the bank during June 2008" and that it had converted "$55 million of outstanding advances from the holding company to the bank . . . into capital contributions during the fourth quarter of 2008." But though "[m]anagement continues to explore various options to internally generate capital/cash that can be down streamed to the bank[,] it does not appear that a significant amount can be generated without disposing of assets at a deep discount." "[T]he holding company lacks the ability to provide any further capital support to the bank," OTS bluntly concluded.

In January 2009, the Bank sent OTS a Risk Reduction Plan intended to cover the 18 months between January 2009 and July 2010. As its name suggests, the Plan was intended mainly to minimize the Bank's high-risk assets: "The objective is to restructure the Bank to create an institution which has approximately one-third fewer assets and 41% fewer high risk assets." Though this approach would not achieve the C&D's mandated 7% and 12% capital ratios (in fact, it would initially reduce these ratios), the Bank pledged to keep the Tier 1 Core and Total Risk-Based capital ratios at 4% and 8%, respectively. Nonetheless, the Bank claimed, this plan was necessary. "Despite exhaustive efforts, the Bank has been unsuccessful in raising capital," and the Bank felt that it could not rely on "capital infusions from external sources." Risk reduction, then, was the only way forward: "Absent the sale of the Bank . . . there are two basic options. First is the risk reduction program proposed in this Plan. Second is an FDIC receivership."

The Plan excluded the possibility of cash infusions from AFC. In an attempt to get the noteholders to waive potential breaches of the Note Purchase Agreement, AFC had proposed giving them AFC's assets (other than the Bank and approximately

$12 million needed to pay debts) and "agree[ing] not to sell [AFC] assets or use the remaining cash . . . for equity contributions to the Bank."

OTS approved the Plan on February 20, 2009, subject to several oversight conditions, and "so long as . . . the plan is successful in meeting its principal objectives and there is no material decline in the financial condition of [the Bank] beyond that which is projected in the plan." Nevertheless, the Bank's position continued to deteriorate through the spring of 2009. On May 26, AFC's board learned that OTS had lowered the Bank's composite rating from 4 to 5. Shortly thereafter, OTS sent the Bank a proposed amendment to its C&D. The Bank's board, however, declined to consent to its entry until it had resolved several issues with OTS, and the amended order never issued.

### E.        Summer – Fall 2009: Noteholder Agreement and "Prompt Corrective Action"

In June 2009, AFC entered into an agreement with its noteholders. Under this agreement, the noteholders agreed to waive AFC's defaults of the Note Purchase Agreement in exchange for a higher interest rate and earlier maturity date on the notes. AFC also agreed to transfer any cash it held, above certain maximum amounts, to the noteholders in monthly "mandatory prepayments." OTS later approved the bulk of this Amended Note Purchase Agreement, which was executed on September 2 with minor modifications to comply with OTS requirements.

Meanwhile, the Bank's position continued to decline. In August, the Bank's Board of Directors approved a resolution permitting the FDIC to enter into discussions with prospective purchasers of the Bank's assets or deposits. By October, AFC was looking at potential alternatives to carrying on business as is, including restructuring and other means of getting rid of its bad assets.

On November 4, 2009, OTS informed the Bank that it had become "Significantly Undercapitalized" and thus subject to "Prompt Corrective Action" under 12 U.S.C. § 1831o(b) and 12 C.F.R. § 565.4(b). According to OTS, the Bank's Total Risk-Based

Capital Ratio was then only 5.39%, and its Tier 1 Risk-Based Capital Ratio was 4.00%. OTS instructed the Bank to submit a PCA ("prompt corrective action") capital-restoration plan or amendment by November 30, per 12 C.F.R. § 565.5, describing how the Bank could return to adequate capital ratios. OTS also informed the Bank that this PCA capital restoration plan must be accompanied by a "guarantee" from AFC (as the Bank's controlling shareholder). The PCA Standard Form of Guarantee and Assurances specifically states that AFC would have to "utilize its available assets, when directed to do so by OTS, to enable the Bank to implement its capital restoration plan," subject to some statutory limitations.

### F.     November 2009: Bankruptcy and Receivership

On November 18, 2009, OTS finalized another examination report. It brought no good news. OTS now officially rated the Bank a "5" overall—the lowest possible score in its rating system—finding that the Bank "continues to be a severely troubled institution." Though the Bank's risk-reduction plan had been working, it was in worse shape because "capital has declined at a much more rapid pace than total assets." The Bank had suffered significant losses, and its "high level of nonearning assets has eliminated any prospects for earnings." At current rates, it stated, "the bank will be insolvent in approximately 6 months." In sum, "The bank in its current format cannot operate profitably," and "failure is highly probable."

AFC filed for Chapter 11 bankruptcy on November 30, 2009—the day AFC's PCA Standard Form of Guarantee and Assurances would have been due. Four days later, OTS closed the Bank and appointed Appellant Federal Deposit Insurance Corporation ("FDIC") as receiver.

### G.     Procedural History

As the Bank's receiver, the FDIC moved the bankruptcy court for an order under 11 U.S.C. § 365(o) requiring AFC to immediately cure the Bank's capital deficit. The FDIC also moved to withdraw the reference as to this motion, which the district court granted.

Once in the district court, both parties filed motions for summary judgment. The district court denied both motions, finding that though AFC had made a commitment to OTS, it was not clear that AFC had committed *to maintain the Bank's capital*, as required by section 365(o). In particular, the part of the C&D requiring AFC to "ensure" that the Bank maintained specific capital ratios was ambiguous; this provision was "susceptible of more than one reasonable interpretation," and so its meaning was a question of fact, not of law.

After a four-day trial, the advisory jury concluded that AFC had not made an enforceable commitment to maintain the Bank's capital. The district court agreed, finding that "Paragraph 8 was intended to create an obligation by the Board to oversee the Bank's attempt[s] to obtain and maintain specific capital [ratios], but there is no evidence that it was intended to create or impose an enforceable obligation by AFC to maintain the capital of the Bank."

The district court entered final judgment in AFC's favor on June 6, 2011. The FDIC filed a timely notice of appeal on June 20, 2011. It challenges both the district court's finding of ambiguity and its ultimate interpretation of the C&D.

## JURISDICTION

The district court had jurisdiction over this action pursuant to 12 U.S.C. § 1819(b)(2)(A) ("[A]ll suits of a civil nature at common law or in equity to which the [FDIC], in any capacity, is a party shall be deemed to arise under the laws of the United States."). This court has jurisdiction over the FDIC's appeal of the district court's final judgment per 28 U.S.C. § 1291.

## STANDARD OF REVIEW

The district court's finding that the C&D is ambiguous is a question of law, subject to *de novo* review by this court. *Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672, 683–84 (6th Cir. 2000). The court's interpretation of ambiguous contract language, however, is a factual matter and may be overturned only if clearly erroneous. *Id.* "A finding of fact will be deemed clearly erroneous only where it is

against the clear weight of the evidence or when upon review of the evidence, the appellate court 'is left with the definite and firm conviction that a mistake has been committed.'" *West v. Fred Wright Constr. Co.*, 756 F.2d 31, 34 (6th Cir. 1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

## ANALYSIS

The goal of contract interpretation under the federal common law[2] is to effect the intent of the parties. *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1376 (6th Cir. 1994). To determine this intent, the law incorporates the traditional methods of contract interpretation. *Id.* Where a contract's meaning is clear on its face, that meaning controls. *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 556 (6th Cir. 1998). Where a contractual provision "is subject to two reasonable interpretations," however, that provision is deemed ambiguous, and the court may look to extrinsic evidence—"additional evidence that reflects the intent of the contracting parties"—to help construe it. *Wulf*, 26 F.3d at 1376 (citing *Smith v. ABS Indus.*, 890 F.2d 841, 846–47 n.1 (6th Cir. 1989); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 112–13 (1989)). The court may make presumptions and draw inferences from extrinsic evidence, though the goal is still to discern the parties' intentions. *Id.* (citing *Boyer v. Douglas Components Corp.*, 986 F.2d 999, 1005 (6th Cir. 1993)).

## A.     Waiver

As a preliminary matter, the court must resolve a dispute over the scope of its review. AFC argues that district court's ambiguity ruling is not before this court for two reasons. We address each argument in turn.

### 1.     *Waiver Under Ortiz v. Jordan*

First, AFC argues that under the Supreme Court's recent decision in *Ortiz v. Jordan*, ___ U.S. ___, 131 S. Ct. 884 (2011), the FDIC waived its right to appeal by

---

[2] AFC's Stipulation and Consent agreement provides that "[t]he laws of the United States of America shall govern the construction and validity of [the C&Ds]."

failing to move for judgment as a matter of law during or after the trial. *Ortiz* involved a prisoner's § 1983 suit against prison officers. *Id.* at 889–90. The defendant officers moved for summary judgment on qualified-immunity grounds, but the district court denied the motion. *Id.* at 890. After the jury returned a verdict for the plaintiff, the officers neither renewed their motion for judgment as a matter of law nor moved for a new trial. *Id.* at 890–91. On appeal, the circuit court reversed, holding that the district court should have granted summary judgment on qualified-immunity grounds. *Id.* at 891. The Supreme Court granted certiorari and reversed, holding that because defendants did not raise the qualified-immunity issue in a Rule 50(b) motion, the Court of Appeals could not review the district court's denial of summary judgment. *Id.* at 893.

*Ortiz* is not applicable here, however. Despite summarizing its ruling in unfortunately broad language,[3] the opinion in *Ortiz* was actually limited to cases where summary judgment is denied because of factual disputes. The Court brushed aside the defendants' claim that they were appealing a purely legal issue that would be preserved for appeal even without a Rule-50 motion: "We need not address this argument, for the officials' claims of qualified immunity hardly present 'purely legal' issues capable of resolution 'with reference only to undisputed facts.'" *Id.* at 892; *see also id.* at 893 ("[T]he qualified immunity defenses . . . do not present 'neat abstract issues of law.'"). Indeed, this court recently recognized that "*Ortiz* leaves open the possibility" that such purely legal claims "may still be considered." *Nolfi v. Ohio Ky. Oil Corp.*, 675 F.3d 538, 545 (6th Cir. 2012); *see also Fencorp, Co. v. Ohio Ky. Oil Corp.*, 675 F.3d 933, 940 (6th Cir. 2012).[4]

---

[3] *See id.* at 888–89 ("May a party . . . appeal an order denying summary judgment after a full trial on the merits? Our answer is no.").

[4] Another panel has read *Ortiz* differently, stating, in an unpublished opinion, that a party's claimed right to appeal, after trial, a summary-judgment denial on purely legal issues "is now clearly foreclosed in light of the Supreme Court's recent decision in *Ortiz v. Jordan*." *Doherty v. City of Maryville*, 431 F. App'x 381, 384 (6th Cir. 2011). This statement was *dicta*, however, as the court ultimately held that the issue was indeed reviewable in the context of a Rule 50(a) motion. *See id.* at 385–86. Similarly, the other cases cited in AFC's supplemental-authority letter do not appear to have applied *Ortiz* to bar review of purely legal issues. *See Turner v. Ramo, LLC*, 458 F. App'x 845, 846 n.1 (11th Cir. 2012) ("We need not address the Ramo Company's argument that a pretrial denial of summary judgment that raises purely legal questions is appealable. The issue the district court resolved at summary judgment . . . did not present a pure question of law."); *In re Carlson*, No. 11-13314, 2012 WL 1059412, *3 (11th Cir. Mar. 30, 2012) (declining to review denial of summary judgment regarding justifiable

The district court's ambiguity ruling was a pure question of law. *See Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672, 683-84 (6th Cir. 2000). Thus, under this circuit's longstanding precedent, the district court's decision "may be appealed even in the absence of a post-judgment motion." *Barber v. Louisville & Jefferson Cnty. Metro. Sewer Dist.*, 295 F. App'x 786, 789 (6th Cir. 2008) (citing *United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Grp., Inc.*, 400 F.3d 428, 441 (6th Cir. 2005)); *see also McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) (allowing appellate review of summary-judgment denial where issue was "purely one of law").

### 2.     *Invited-Error Doctrine*

AFC next cites the invited-error doctrine, which holds that "a party may not complain on appeal of errors that he himself invited or provoked the court or the opposite party to commit." *Harvis v. Roadway Exp. Inc.*, 923 F.2d 59, 60 (6th Cir. 1991). AFC claims that the FDIC invited the very ruling that it now claims as error by arguing, in the course of opposing AFC's Rule-52 motion for judgment on partial findings at the close of the FDIC's case, that the jury rather than the judge should decide the meaning of the C&D.

AFC fails to appreciate the context in which these statements were made, however. Ambiguity was not at issue in AFC's Rule-52 motion. That question had been decided earlier in the case, and it was not being reargued. The trial itself had been predicated on the existence of an ambiguous contract. As such, neither party argued the issue of ambiguity, and the district court did not rule on the issue at that time. With neither an erroneous ruling on ambiguity nor an invitation by the FDIC to commit such error, the FDIC's Rule-52 argument cannot prevent appeal on this issue.

### B.     Ambiguity

Next, we review the district judge's finding that the C&D is ambiguous. The FDIC's argument focuses on paragraph 8 of AFC's C&D, which provides, "The Board

---

reliance where "the court made factual findings on the justifiable reliance issue at trial").

shall ensure that the Association complies with all of the terms of its Order to Cease and Desist issued by OTS on November 19, 2008." The "Association" here is the Bank, and its C&D required that it "have and maintain: (i) a Tier 1 (Core) Capital Ratio of at least seven percent (7%) and (ii) a Total Risk-Based Capital Ratio of at least twelve percent (12%)." Under the FDIC's reading, this language bound AFC's board to take whatever steps necessary to satisfy the terms of the Bank's C&D, including the requirement that the Bank keep capital ratios within the specified ranges. To the extent that the Bank failed in doing so itself, AFC would be required to step in and, if necessary, buttress the Bank's capital with its own funds.

Based on this text alone, the FDIC's interpretation of the C&D is reasonable. As the FDIC argues, the words "shall ensure" can reasonably be read to create obligations. *See, e.g.*, Merriam-Webster's Collegiate Dictionary 416 (17th ed. 2008) (defining "ensure" as "to make sure, certain, or safe : GUARANTEE"). The question before this court, however, is not simply whether the FDIC's interpretation is reasonable, but whether it is the *only* reasonable interpretation of the C&D. The FDIC cannot show this, for several reasons.

First, the connotations of "ensure" are not necessarily as clear and absolute as the FDIC claims. The sentence, "The Board shall ensure that the Association complies," signals that the board is supposed to take steps to make the Association compliant, but it does not specify the means that the board is to employ. *Cf. Mendoza v. State of California*, No. BS 105 481, 2006 WL 3771018, at *2 (Cal. Super. Ct. Dec. 21, 2006) ("AB 1381 provides only that the mayor '*shall ensure* that the cluster is represented in the partnership' by the representatives of the groups specified. It is unclear if 'shall ensure' means that the Mayor personally has the ultimate choice of partners . . . ."). At the very least, the board is limited by what it has the legal authority to do, as paragraph 15 confirms: "Nothing in this Order shall be construed as allowing the Holding Company, its Board, officers or employees to violate any law, rule, or regulation." But is the board required to go to the bounds of that power? Must it issue stock or sell its assets (even at a loss) and give the proceeds to the Bank? Must it breach contracts (such

as the Note Purchase Agreement)? Without context, the answers are unclear, though one can imagine scenarios where the term "ensure" covers some, all, or none of these requirements. The point here is that the words "shall ensure," on their own, will not preclude ambiguity. *See United States v. Citizens Republic Bancorp, Inc.*, No. 11-cv-11976, 2011 WL 2014873, at *1 (E.D. Mich. May 24, 2011) (rejecting proposed order due to (among other things) its "use of the term 'ensure' without defining Defendants' duties and responsibilities to 'ensure' that loan products are available and marketed in certain areas— *i.e.*, does 'ensure' mean guarantee?").

In construing paragraph 8, it is important to examine what follows the term "ensure"—that is, just what AFC's board is ensuring. Here, the C&D speaks indirectly: AFC's board is not simply to ensure that the Bank's capital ratios meet certain standards; instead, it must "ensure that the Association complies" with the terms of its own C&D. That is, the Bank is the one to maintain the capital ratios, while AFC's Board is to "ensure" that it does so. This indirection arguably suggests a narrower obligation than the FDIC desires. Ensuring that another party does something is different from doing that thing directly, and it not clear from this phrasing that paragraph 8 was intended to obligate AFC to maintain the Bank's capital ratios itself if the Bank did not do so.

The C&D is also inconsistent about the entity it is supposedly obligating. Paragraphs 1–7 all specify that "the Holding Company" shall take certain actions or refrain from taking certain actions, whereas paragraphs 4(b), 6, and 8 all provide that "[t]he Board" shall take certain actions. The FDIC argues that these two terms are effectively identical, because "there is no legal distinction between a corporation and the board through which the corporation acts, and thus an obligation of the board is, by law, an obligation of the company." This statement is correct in at least one sense. As AFC admits, "As a matter of corporate law, few would quibble" with the proposition that a corporation acts through its board of directors. But there are other senses in which the two terms are clearly not equivalent. Referring to a corporation's assets as those of its board, for instance, would make little sense. Further, several of the C&D's provisions appear to distinguish between AFC and its Board, suggesting that the drafters did not

understand the terms as fully equivalent.  Paragraph 15, for instance, clarifies that "[n]othing in this Order or the Stipulation shall be construed as allowing the Holding Company, its Board, officers or employees to violate any law, rule, or regulation." Paragraph 4 both instructs "the Holding Company" to submit "a detailed capital plan" to maintain certain capital ratios at the Bank, and orders "[t]he Board" to "monitor and review the sufficiency of the [Bank's] capital position."  Paragraph 6 also distinguishes between the Holding Company, which "shall not enter into, renew, extend or revise any contractual arrangement related to compensation or benefits for any director or Senior Executive Officer," and the Board, which "shall ensure that any contract, agreement, or arrangement submitted to OTS fully complies with" certain relevant regulations.  And the C&D's first recital notes that the "Holding Company" stipulated to the C&D "by and through its Board of Directors (Board)," defining the two entities separately, though essentially acknowledging that AFC often acts through its Board.

The FDIC does not attempt to reconcile its reading of "Board" with these provisions separating the board from the company as a whole.  As a result, its preferred construction would render the separate definition of "Board" superfluous.  Because the parties are unlikely to have intended a contract with duplicative terms, the courts avoid such a reading when possible.  *See Dotson v. Arkema, Inc.*, 397 F. App'x 191, 194 (6th Cir. 2010).

Even if the court accepted the FDIC's argument that references to AFC's board of directors are effectively references to AFC itself, paragraph 8's reference to "the Board" could still be relevant to the meaning of the provision.  The role of a company's board of directors is largely one of oversight; the board does not and indeed cannot make all of a company's decisions, and much of the day-to-day work at a company is done by its executives, managers, and employees. *Cf. In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996) (holding that a board of directors violates the duty of good faith by a "sustained or systematic failure . . . to exercise reasonable oversight"). Both paragraph 4(b) and paragraph 6—the only other provisions specifically directed at AFC's Board—appear to involve matters of oversight and review, suggesting that this

oversight role has been written into the C&D itself.  Paragraph 4 is particularly instructive.  Its subpart (b) specifically puts AFC's Board in a supervisory role: "The Board shall monitor and review the sufficiency of the [Bank's] capital position in relation to the Association's risk profile on a quarterly basis."  Similarly, Paragraph 6 simultaneously requires that "the Holding Company . . . not enter into, renew, extend or revise" certain contractual arrangements and that "[t]he Board . . . ensure" that any proposed contract "fully complies with" regulations.  This enacts a broad prohibition against certain actions taken by the company as a whole, but arguably provides a narrower oversight role for the Board, which is responsible for "ensur[ing]" regulatory compliance.  This context suggests that paragraph 8's reference to "the Board" could also be meant to invoke its supervisory role, merely directing the Board to oversee the Bank's attempts to comply with its own C&D.

The FDIC raises several counter-arguments.  First, it notes that the words "monitor and review" in paragraph 4(b) shows that the drafters knew how to specify oversight when they wanted to do so.  Their failure to similarly specify in paragraph 8 thus implies that they intended more than a supervisory role here.  Further, the FDIC argues that reading paragraph 8 to require only an oversight role for AFC's Board would make Paragraph 4(b)'s "monitor and review" provision superfluous.  It is true that this provision would overlap with the oversight requirement that AFC proposes.  But this overlap would only be partial.  Paragraph 4(b) requires specific actions by the Board—quarterly reviews comparing the Bank's capital position to its risk profile, reflected in Board meeting minutes—that are not necessarily part of a general oversight obligation.  Conversely, the Bank's C&D contains more than just the capital-ratio requirements, and so a general obligation to oversee compliance with that order would be broader than paragraph 4(b)'s narrow requirement.  Under AFC's reading, therefore, neither paragraph would be entirely superfluous, as each would retain some effect separate and apart from the other.  The remaining partial overlap between paragraph 4(b) and paragraph 8 is not enough to make AFC's interpretation unreasonable, particularly given the superfluity created by the FDIC's proposed reading of "the Board" as equivalent to "the Holding Company."

There is enough textual evidence in the C&D to support both an interpretation where AFC has committed to maintain the Bank's capital ratios and an interpretation where AFC's Board is required only to oversee the Bank's efforts to improve its capital ratios. Neither interpretation is perfect. Each strains in certain areas and each creates superfluities and awkward interpretations in other parts of the C&D. But none of these difficulties are so great as to make either reading unreasonable. The C&D is therefore ambiguous, as the district court correctly found.

### C.      Agency Deference

The FDIC next argues that even if the C&D is ambiguous, OTS has already settled its meaning by interpreting the C&D as imposing a capital-maintenance requirement on AFC. The FDIC points to OTS's February 2009 examination report, which (among other things) evaluated AFC's compliance with the C&D. Regarding paragraph 8, the report found: "As previously stated, the holding company and the bank were not in compliance with the minimum capital requirements of paragraph 4.a. of the C&D at December 31, 2008." The FDIC argues that this shows OTS's understanding that both the holding company and the bank were required to maintain the Bank's capital, and this reasonable interpretation of OTS's own order is controlling under Supreme Court precedent. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997) (holding that Secretary of Labor's interpretation of his own regulations is controlling).

*Auer* deference is not absolute, however. Courts need not defer to an agency's interpretation that "is plainly erroneous or inconsistent with the regulation[s]" or where there is any other "reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Chase Bank USA, N.A. v. McCoy*, 562 U.S. ___, 131 S. Ct. 871, 880–81 (2011) (quoting *Auer*, 519 U.S. at 461, 462) (internal quotation marks omitted). This qualification applies here. If taken at face value, the report's claim that both "the holding company and the bank were not in compliance with the minimum capital requirements of paragraph 4.a." was clearly incorrect. Paragraph 4(a) created no minimum capital requirements at all, let alone ones that applied to both AFC and the Bank. Though OTS probably meant that the Bank was

not in compliance with its own capital-maintenance obligation *as referenced* in paragraph 4(a), this lack of precision makes it impossible for us to read the conclusion as a clear statement that AFC was obligated to maintain the Bank's capital. If this statement is not too vague to be considered an interpretation on this point, it is plainly inconsistent with the C&D itself and thus not a reflection of fair and considered judgment. In either case, it is not entitled to *Auer* deference.

### D.       Extrinsic Evidence and Construction of the Agreement

The FDIC next challenges the district court's ultimate interpretation of the C&D. It argues that the lower court erred on two fronts, both by using extrinsic evidence improperly and by failing to recognize pertinent evidence supporting the FDIC's interpretation.

#### 1.       *The Trial*

Only the FDIC put forward a case at trial, presenting the testimony of five witnesses. Three of those witnesses' testimony is not particularly relevant to the issues on appeal, but the other two witnesses did testify regarding the cease-and-desist orders. The first of these two, Joseph Campanella, had been a board member of both AFC and the Bank from late 2001 to December 2009. He testified at length about the events leading up to this suit. Of relevance here, Mr. Campanella testified that he did not understand the C&D to be a guarantee of the Bank's performance, nor did he understand AFC to be committing itself to infuse capital into the bank or to maintain its capital ratios. Instead, he read the document as creating an oversight responsibility for AFC's board. The second witness, Daniel McKee, testified through deposition excerpts. Mr. McKee had been OTS regional deputy director of operations during most of the relevant time period. He stated his understanding that the C&D did not create a capital-maintenance obligation; instead, paragraph 8 was addressed only to the board's responsibility as an overseeing body.

At the end of the trial, the advisory jury concluded that AFC had not made an enforceable commitment to maintain the Bank's capital. The district court agreed,

finding that "Paragraph 8 was intended to create an obligation by the Board to oversee the Bank's attempt[s] to obtain and maintain specific capital [ratios], but there is no evidence that it was intended to create or impose an enforceable obligation by AFC to maintain the capital of the Bank."

The FDIC's witnesses did not help its case, the court found, and the testimony of both Mr. Campanella and Mr. McKee actually tended to support AFC's case. The court noted that the circumstantial evidence also favored AFC's reading of the C&D. Among other things, the court found "absolutely no evidence that the OTS ever attempted or intended to enforce any such [capital-maintenance] commitment." Further, AFC's "failure to [execute a formal guarantee] constitutes powerful evidence that AFC never intended to make such a [capital-maintenance] commitment at that time, or any time prior," and "[t]he Risk Reduction Plan expressly disavowed any notion that AFC intended to provide any capital contributions in order to maintain the capital of the Bank." As the party bearing the burden of proof, the FDIC's failure to present sufficient evidence was fatal: "[T]here is no evidence that the terms of the Cease and Desist Order at issue in this case[] imposed upon AFC, as a matter of law, an obligation to maintain the capital of the Bank." In sum, the court found "that the FDIC failed to present sufficient evidence to establish that either the OTS or the AFC understood or intended for the documents at issue to impose or create a commitment by AFC to maintain the capital of the Bank."

### 2.    *The Court's Use of Extrinsic Evidence*

The FDIC initially argues that the court improperly relied on the testimony of AFC board member Campanella. It claims that Mr. Campanella's testimony is legally irrelevant for two reasons. First, the FDIC argues that because OTS drafted the C&D, only its understanding of the agreement's terms is relevant. Second, the FDIC argues that because section 365(o) is not limited to guarantees and commitments to make direct

infusions of capital, Mr. Campanella's testimony, which concerned only such guarantees and commitments, is not relevant to whether section 365(o) applies.[5]

The FDIC is wrong on both counts. First, hornbook law holds that the intent of both parties to a contract is relevant to construing its terms. *See, e.g.*, Restatement (Second) of Contracts § 201 (1979). As one of the AFC board members who agreed to entry of the C&D, Mr. Campanella's testimony is relevant to AFC's understanding of the terms to which it was agreeing. The FDIC's citation to *Potti v. Duramed Pharm., Inc.*, 938 F.2d 641 (6th Cir. 1991), which held that a witness could not testify to the meaning of an agreement when the witness "was not a party to the Escrow Agreement nor was he involved in the drafting of the Agreement" *id.* at 647–48, is therefore inapposite. The FDIC argues that "[w]hat AFC thought of the Stipulation and Order is . . . irrelevant" because "it believed that it had little choice but to sign if it wanted the Bank to remain open." But it provides no evidence that AFC actually held such a belief, let alone any legal authority supporting such an exception to standard contract-interpretation principles.

The FDIC's second argument confuses relevant and dispositive evidence. The FDIC admits that a guarantee or commitment to infuse capital would satisfy section 365(o); indeed, it has injected the capital-infusion issue into its own case, arguing that AFC's capital infusions are themselves evidence of a commitment to maintain the Bank's capital. Thus, even if Mr. Campanella's testimony relates only to this subset of section 365(o), it is clearly relevant to that extent.

Later in its briefing, under the title "The Court Misconstrued Section 365(o)," the FDIC takes this argument a step further. Despite the heading, the FDIC does not actually claim that the district court misconstrued the statute, only that it misapplied its construction. The FDIC accepts the court's holding that "the statute does not require a commitment to 'infuse equity capital,' or an 'absolute guarantee of performance,'

---

[5]The FDIC also argues that Mr. Campanella's testimony is unreliable because it is contradicted by other documents and evidence. This is just another facet of its affirmative case (or lack thereof), which is discussed below.

although such promises are clearly included in the realm of 'commitments to maintain capital.'" The FDIC argues, however, that the district court failed to follow its own construction when it based its decision in part on Mr. Campanella's testimony.

Even under this broad interpretation of section 365(o)—which we do not pass judgment on today—the FDIC's argument fails. While it may be true that Mr. Campanella's testimony, standing alone, would not definitively prove that section 365(o) is inapplicable, the district court did not find otherwise. The court properly examined all the evidence regarding the parties' understandings of the C&D and found, based on the totality of that evidence, that the FDIC did not satisfy its burden of proof. The court did not rely exclusively on Mr. Campanella's testimony; nor did it use that testimony for any improper purpose. The FDIC's claim to the contrary therefore fails.

Next, the FDIC argues that the district court drew improper inferences from three sets of facts: (a) AFC's failure to sign a guarantee in response to OTS's corrective action; (b) OTS's failure to enforce the Order; and (c) the statement in AFC's Risk Reduction Plan stating that it "assumes no further capital contributions will be received from the holding company." At heart, these objections are based largely on the already-rejected assumption that only the drafter's contemporaneous intent is relevant to interpretation. But making inferences from circumstantial evidence and the parties' course of performance is standard procedure in construing ambiguous contracts. *See, e.g.*, *Boyer v. Douglas Components Corp.*, 986 F.2d 999, 1005 (6th Cir. 1993) ("[A] court may use traditional methods of contract interpretation to resolve the ambiguity, including drawing inferences and presumptions and introducing extrinsic evidence."); Restatement (Second) of Contracts § 202(1), (4) ("Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight"; "any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement."). While the FDIC can question the extent to which the inferences should hold here, it cannot show that they are categorically improper. Its objection therefore fails.

### 3.      *The FDIC's Evidence*

The FDIC also makes an affirmative case for its interpretation, arguing that the district court failed to consider legally pertinent evidence allegedly demonstrating that OTS and AFC interpreted the C&D as requiring AFC to maintain the Bank's capital.

First, the FDIC again cites the February 2009 examination report's statement that AFC was not in compliance with Paragraph 8 because, "[a]s previously stated, the holding company and the bank were not in compliance with the minimum capital requirements of paragraph 4.a. of the C&D at December 31, 2008." As discussed regarding the FDIC's agency-deference argument, this statement is either irredeemably vague or plainly mistaken. Paragraph 4(a) only applied to AFC, and it only required submission of a plan to maintain the Bank's capital. Contrary to the literal meaning of the report's claim, neither AFC nor the Bank could have violated this section by failing to maintain the specified capital ratios. The FDIC rather boldly claims that this flatly incorrect statement was both "meaningful and intentional" and in fact proves that the capital-ratio requirements applied to both parties, but it provides no logical basis for this leap. The more likely explanation is that the statement was simply imprecise in matching AFC and the Bank with their respective obligations. This imprecision prevents us from reading the statement to confirm that OTS saw a capital-maintenance obligation in the C&D. Nor can one infer anything about AFC's understanding of the C&D from its failure to object to this unclear statement.

Next, the FDIC quotes AFC executives and board members as acknowledging the "need" to improve the Bank's capital. As AFC points out, however, the Bank's capital did need to improve at that time, as it was below the agreed-upon levels. The board's acknowledgment of that fact says nothing about whether AFC had committed to maintain the Bank's capital, and the meeting minutes do not clarify that point.

The FDIC also argues that the AFC board's discussion of the noteholders' threat letter supports its interpretation of the C&D. In the board meeting following receipt of this letter, one board member expressed concerns "that the [noteholders'] position conflicts with the OTS objectives of wanting capital going into the Bank from the

Corporation," and another wanted to consider a declaratory judgment action "where there is a possible conflict between OTS requirements for capital infusion for [the] Bank and Senior Noteholder demands that [AFC] retain its assets." Though these statements do lend some support to the FDIC's position, they are far from dispositive. Not only are these the statements of single board members, but the two statements suggest different understandings of AFC's obligations. While the second statement refers to "OTS requirements for capital infusion," the first statement mentions only "OTS objectives." Further, the second statement refers only to a "possible conflict," suggesting uncertainty about the facts.

The FDIC also finds support in AFC's decision to recharacterize $14.9 million of debt to the Bank, "thereby increasing the capital ratios of the Bank" and satisfying its "previous[] commit[ment] to the Office of Thrift Supervision to make a capital contribution to the Bank of at least $10 million." The evidence, however, including the unrebutted deposition testimony of Peter Goldberg, President of both AFC and the Bank, shows that this specific commitment was unrelated to the C&D.

Finally, the FDIC argues that the court should have drawn a favorable inference from the context in which the C&Ds were entered. Because the Bank had already failed to maintain the capital ratios that it had agreed to, the FDIC submits, the C&Ds must have been intended to add further restrictions on the Bank and AFC. The FDIC's logic is fair, but its conclusion does not follow. Unlike an informal agreement or a memorandum of understanding, a cease-and-desist order is a formal enforcement action. It is made public and can be enforced in the courts. *See* 12 U.S.C. § 1818(b)–(d), (I), (u) (2009). By its nature, then, the C&D placed more restrictions on AFC than the prior, informal agreement had, even if it lacked a capital-maintenance obligation.

### 4.        *Weighing the Evidence*

The ultimate question for this court is whether, in light of the evidence, the district court committed clear error by finding that the C&D's paragraph 8—which provides that "[t]he Board shall ensure that the [Bank] complies with all of the terms of

its Order to Cease and Desist issued by OTS on November 19, 2008"—did not obligate AFC to maintain the Bank's capital.

As discussed above, the FDIC points to little evidence that the parties understood paragraph 8 to obligate AFC to maintain the Bank's capital ratios. Much of the FDIC's proffered evidence shows that AFC wanted to improve the Bank's capital. But this evidence is not particularly compelling, because AFC could have wanted the Bank to be adequately capitalized for reasons entirely separate from any capital-maintenance obligation. The parties' motivations point the same way here, because both OTS and AFC wanted to keep the Bank solvent. Further, because of OTS's regulatory power over the Bank, AFC had incentives to follow OTS's capital-ratio suggestions even if it was not obligated to do so. The FDIC fails to distinguish these possible motivations, leaving uncertainty about whether AFC was acting because it believed it was obligated to do so under the C&D, whether it was acting because it wanted to get out from under OTS's regulatory thumb, or whether it was acting simply out of a desire to keep the Bank solvent through a difficult period.

The strongest evidence of a capital-maintenance obligation is an AFC board member's late-2008 worry about a "possible conflict between OTS requirements for capital infusion for [the] Bank and Senior Noteholder demands that [AFC] retain its assets." But as discussed above, this statement is partially undercut by a different board member's reference to "OTS objectives" rather than requirements. A third board member, Mr. Campanella, testified that he knew of no capital-infusion obligation, further weakening any suggestion that this statement proves the intent or understanding of AFC's board. Finally, OTS expressly approved the later agreement between the noteholders and AFC that strictly limited AFC's ability to contribute funds directly to the Bank, suggesting that it did not see a conflict between AFC's obligations and noteholders' demands.

Other evidence suggests that OTS itself agreed with AFC's interpretation. Its March 2009 examination report noted that AFC "lacks the ability to provide any further capital support to the bank." OTS raised the possibility of AFC selling its assets at a

loss, but it neither required this nor suggested that AFC should in fact take this step, suggesting that OTS saw nothing to be done from AFC's perspective. Mr. McKee's testimony further supports this view. He stated that he did not read AFC's C&D to create a capital-maintenance obligation and that he understood paragraph 8 to refer to the board's oversight role only.

Further, the overall course of events supports AFC's interpretation of the C&D. As the Bank's financial position steadily declined, OTS's regulatory interest in the Bank and AFC rose. After the Bank's composite rating dropped to a 3 in June 2008, OTS required only a private memorandum of understanding and a plan to raise capital. When that plan failed and the Bank's rating dropped to a 4, OTS required a public, judicially enforceable cease-and-desist order. Though the C&D also failed to increase the Bank's capital ratios, OTS accepted a temporary Risk Reduction Plan, understanding that AFC lacked the ability to contribute more capital to the Bank without selling its assets at a steep discount. Similarly, OTS approved AFC's agreement with its noteholders that essentially forbid AFC from directly contributing capital to the Bank. Finally, when the Bank's rating fell to a 5, OTS initiated "prompt corrective action" and required AFC to sign a formal guarantee that it would "utilize its available assets, when directed to do so by OTS, to enable the Bank to implement its capital restoration plan." Though AFC did not execute this guarantee before it filed for bankruptcy, OTS made clear that it was required for the Bank's continued existence as an AFC subsidiary.

As the FDIC admits, one would expect increasingly stronger regulatory actions as the Bank's situation became more dire. Under AFC's reading of the C&D, this would indeed be the case. But under the FDIC's interpretation, the PCA Standard Form of Guarantee and Assurances would have been superfluous. This does not definitively prove AFC's position; as the FDIC argues, the PCA guarantee was required by law regardless of whether a capital-maintenance obligation already existed. But this pattern of increasingly strict regulatory action corresponds with the Bank's increasingly tenuous financial position and supports the bulk of the testimony and documentary evidence,

which suggests that neither OTS nor AFC saw the cease-and-desist order as creating a capital-maintenance obligation.

In light of these facts, the district court's finding cannot be said to be "against the clear weight of the evidence" here. *West v. Fred Wright Constr. Co.*, 756 F.2d 31, 34 (6th Cir. 1985) (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). The court's ruling in AFC's favor was therefore not clearly erroneous.

## CONCLUSION

Despite the complicated fact pattern and the variety of legal arguments raised in the parties' briefs, the ultimate issues here are relatively straightforward. The district court correctly held that the C&D is ambiguous on its face because paragraph 8's requirement that AFC's board "ensure that [the Bank] complies" with its own cease-and-desist order can reasonably be read as establishing either an oversight role or a capital-maintenance commitment. OTS's alleged interpretation of the C&D is not entitled to deference because it is too vague to be considered an interpretation or else because it is a clearly erroneous reading of the C&D. And the district court's decision construing the C&D as not including a capital-maintenance commitment was not clearly erroneous because the bulk of the extrinsic evidence favors the "oversight" reading of the C&D.

For these reasons, we **AFFIRM** the district court.